[No. S121552. May 20, 2010.]

MIGUEL MARTINEZ et al., Plaintiffs and Appellants, v.
CORKY N. COMBS et al., Defendants and Respondents.

**Counsel**

Law Offices of Talamantes/Villegas/Carrera, Mark Talamantes, Jennifer Reisch; California Rural Legal Assistance, Inc., William G. Hoerger, Michael C. Blank; California Rural Legal Assistance Foundation, Inc., and Julia Montgomery for Plaintiffs and Appellants.

Virginia Ruiz for Farmworker Justice, National Employment Law Project and United Farm Workers as Amici Curiae on behalf of Plaintiffs and Appellants.

Schneider & Wallace, Joshua Konecky and W.H. "Hank" Wilson IV for Centro Legal de La Raza, Golden Gate University Women's Employment Rights Clinic, The Katharine and George Alexander Community Law Center, The Legal Aid Foundation of Los Angeles, The Legal Aid Society of San Francisco-Employment Law Center and Neighborhood Legal Services of Los Angeles County as Amici Curiae on behalf of Plaintiffs and Appellants.

Law Offices of Carroll & Scully, Donald C. Carroll and Charles P. Scully II for California Labor Federation, AFL-CIO as Amicus Curiae on behalf of Plaintiffs and Appellants.

Anastassiou & Associates, Jane E. Bednar and Effie F. Anastassiou for Defendant and Respondent Apio, Inc.

Western Growers Law Group, Noland, Hamerly, Etienne & Hoss and Terrence R. O'Connor for Defendants and Respondents Corky N. Combs and Larry D. Combs dba Combs Distribution Co., and Juan Ruiz.

Monte B. Lake for California Farm Bureau Federation, Agricultural Council of California, California Citrus Mutual, California Grape and Tree Fruit League, Grower-Shipper Association of Central California, Imperial Valley Vegetable Growers Association, Nisei Farmers League, Ventura County Agricultural Association, Western Growers Association and Wine Institute as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**WERDEGAR, J.**—Plaintiffs, seasonal agricultural workers, brought this action under Labor Code section 1194[1] and other theories to recover unpaid minimum wages. Plaintiffs contend the Industrial Welfare Commission's (IWC) wage order No. 14-2001, entitled "Order Regulating Wages, Hours, and Working Conditions in Agricultural Occupations" (Cal. Code Regs., tit. 8, § 11140), commonly known as Wage Order No. 14, defines defendants as their employers for purposes of section 1194. The lower courts rejected the argument. We affirm.

## I. BACKGROUND

This case arises out of the strawberry farming operations of Isidro Munoz, Sr., who did business as Munoz & Sons (Munoz). Plaintiffs are seasonal agricultural workers whom Munoz employed during the 2000 strawberry season: Antonio Perez Cortes, Catarino Cortez, Otilio Cortez, Asuncion Cruz, Hilda Martinez and Miguel Martinez. Munoz, originally named as a defendant, has been granted a discharge in bankruptcy. The remaining defendants are two of the produce merchants through whom Munoz sold strawberries: Apio, Inc. (Apio), and Combs Distribution Co.,

---

[1] All further statutory citations are to the Labor Code, except as noted.

together with its principals, Corky N. Combs and Larry Combs, and its field representative Juan Ruiz (collectively Combs). Plaintiffs' separate action against a third merchant, Frozsun, Inc. (Frozsun), has been stayed pending the outcome of this action. A fourth merchant, Ramirez Brothers, has petitioned for bankruptcy.

During the 2000 season, Munoz grew and harvested strawberries in the Santa Maria Valley, which lies on the Central Coast along the border of San Luis Obispo and Santa Barbara Counties. Munoz farmed a total of 130 acres divided among four sites. He leased two 30-acre sites (the "Oceano" and "Zenon" fields) from defendant Apio and a 40-acre site (the "El Campo" field) from an unidentified third party.[2] Munoz had leased the Oceano and El Campo fields in prior years. He rented an additional 30-acre site (the "Santa Maria" field) from Ramirez Brothers. Munoz operated his business as a single, integrated concern, using his employees and equipment in all four fields, as needed, and combining his revenues and expenses. During the peak of the harvest, Munoz employed approximately 180 agricultural workers, three foremen (including his brother, Armando Munoz) and two office workers (including his son, Isidro Munoz, Jr.). Munoz owned his equipment, including trucks, tools and strawberry carts, and paid his own business expenses, including plants, fertilizer, pesticide, irrigation, fuel, packaging, and rent for additional trucks, a large tractor and field toilets. On the occasions when Apio and Combs paid Munoz's expenses in the first instance, they billed him. Both defendants, for example, charged Munoz for packaging that bore their companies' labels, and for refrigeration, and Apio charged Munoz for his portion of the cost of a shared irrigation system.

Munoz grew and harvested strawberries for two distinct markets: fresh sale to consumers in markets, and sale for processing (typically freezing). Fresh market and freezer berries are harvested differently. Fresh market berries cannot be too green or too ripe, and the calyx (sepals and stem) is left attached. Market berries are packed in the field, as they are picked, into the containers in which they will be sold to consumers, such as plastic baskets or clamshell boxes. Freezer berries, in contrast, are selected for advanced ripeness and packed in bulk into crates with the calyx removed. Munoz harvested strawberries for both markets from the same fields. He decided which fields to harvest on any given day, and whether to harvest for fresh market sale or the freezer, based largely on the need to pick fields every three days, informing the merchants of his schedule and taking into account their orders and the berries' condition.

---

[2] The parties sometimes refer to these fields by other names: the Oceano field as the Phelan and Taylor Ranch, El Campo as Mesa One, and Zenon as Mesa Two.

The four produce merchants through which Munoz sold strawberries are not related to one another. Munoz had dealt profitably with defendant Apio for three years prior to 2000, and with defendant Combs for one. The principals of Ramirez Brothers were Munoz's personal friends. Apio, Combs and Ramirez Brothers dealt only in fresh market berries, and Frozsun dealt only in freezer berries. Apio, Combs and Frozsun each accepted berries from many independent growers, not just Munoz. Combs also sold beans for Munoz after the strawberry season ended.

Munoz had different contractual relationships with each merchant. Apio and Combs acted as produce brokers, selling Munoz's strawberries for a commission and remitting to him the net proceeds.[3] Munoz retained title until sale. Both defendants, following a common practice of produce merchants on the Central Coast, advanced money to Munoz before the season began, in exchange for exclusive rights to fresh produce from designated fields. These advances were retired over the season from sales revenues. Apio and Combs handled payment differently. Combs agreed to remit the actual net proceeds of sale to Munoz within 21 days, in weekly payments, minus a deduction for loan repayment (30 percent), expenses such as packaging materials and cooling, and an 8 percent commission. Apio operated similarly and charged the same commission but, rather than making weekly payments to Munoz of actual net proceeds, paid him estimated net proceeds in the form of a weekly "Pick-Pack" payment that was initially set at $2 per carton but actually varied with the price of strawberries. Frozsun, which purchased strawberries exclusively for processing, paid Munoz on delivery the official "field price" posted by the Processing Strawberry Advisory Board of California. Munoz and Ramirez Brothers, being personal friends, conducted business without a written contract. Their understanding was that Munoz would pay for plants and labor and Ramirez Brothers would pay all other expenses, remitting net profits to Munoz after recovering their costs.

Munoz's financial resources for the 2000 season came from many sources. Much of his cash during the season came from sales proceeds, including at least $378,392 in Pick-Pack payments (estimated net proceeds) from Apio, $476,955 in net proceeds from Frozsun, and an unspecified amount from Combs. Munoz also invested at least $500,000 of his own funds and an unspecified amount of loan proceeds. The record does not identify all of Munoz's financing sources. Some financing, as noted, came from the produce merchants. Apio advanced Munoz $163,000, or $2,716 per acre for the

---

[3] Munoz, who speaks only Spanish, dealt with defendants Apio and Combs through their field representatives, respectively Juan Toche and Juan Ruiz.

Oceano and Zenon fields, and Combs advanced $80,000, or $2,000 per acre for El Campo. These advances were not intended to cover Munoz's actual costs for growing and harvesting strawberries, which were far higher.[4] The vice-president of Apio described that company's advances as covering rent for the Oceano and Zenon fields. Frozsun agreed to make or facilitate a loan of up to $225,000 in exchange for the exclusive right to purchase freezer and cannery berries from all of Munoz's acreage. Munoz also received loans from personal friends and financing for equipment from Ford Motor Company and John Deere.

Munoz alone, with the assistance of his foremen, hired and fired his employees, trained them when necessary, told them when and where to report to work, when to start, stop and take breaks, provided their tools and equipment,[5] set their wages, paid them, handled their payroll and taxes, and purchased their workers' compensation insurance.[6]

Munoz and his foremen also supervised his employees. Plaintiffs contend defendants Apio and Combs participated in the supervision, characterizing as supervision the activities of defendants' field representatives in the areas of quality control and contract compliance. We will return to this subject below. (See, *post*, at p. 75 et seq.) Summarizing for present purposes, picking and packing strawberries for fresh market sale necessitated communication in the field, during the harvest, between defendants and Munoz's personnel. Both Apio and Combs regularly sent field representatives to ascertain the quality of available strawberries and to explain the manner in which they were to be packed. Apio sent their representatives Juan Toche and Manuel Cardenas. Combs sent defendant Juan Ruiz, who performed similar services for many entities and whom Combs eventually hired as an employee in June 2000. Munoz's contract with Apio expressly provided for these quality control activities. The contract provided, under the headings "Performance Oversight and Coordination" and "Quality of Crops," that Apio would "set the standards for, and be the sole judge of, the quality and maturity of the Crops and the pack," and that Apio would "have the right to send its quality control personnel to the fields . . . at any time to confirm that the Crops . . . are the

---

[4] The parties refer to a publication from the University of California Cooperative Extension, which estimates average total operating costs in the 2001 season in the Santa Maria Valley as $21,390 per acre. (U. Cal. Cooperative Extension, Sample Costs to Produce Strawberries: South Coast Region—Santa Maria Valley (2001) p. 10.)

[5] Some employees used their own gloves and strawberry carts. Munoz provided these tools for those who did not.

[6] At some point in the 2000 season, Munoz fell behind on workers' compensation insurance payments.

quality required for purchase by [Apio] and/or marketing and sale under [Apio's] labels . . . ." Munoz operated the same way with Combs, apparently as a matter of standard practice, even though the parties' terse, single-page contract did not address the subject.

Munoz began delivering fresh market strawberries to Apio and Combs sometime in March 2000. He delivered the last fresh berries to Apio on May 16, 2000, and to Combs on May 18, 2000. The freezer berry harvest began at the end of April and thus overlapped the last few weeks of the fresh berry harvest. When the fresh berry harvest ended, the freezer berry harvest greatly increased. To illustrate, as of May 20 Munoz had sold to Frozsun a total of 175,400 pounds of freezer berries for $31,663. In the next week alone (ending May 27), Munoz sold 787,208 pounds for $149,340. Sales to Frozsun continued until August 12, eventually totaling 2,608,781 pounds and $476,955 in payments to Munoz.

In the last few weeks of the fresh strawberry harvest, the market for fresh berries deteriorated. According to Munoz, more berries were grown and harvested in 2000 than the market could handle. Apio, Combs and Ramirez Brothers were receiving poor prices for berries and, in some cases, no price at all when customers took berries on consignment. Apio's Pick-Pack payments of estimated net proceeds, initially set at $2 per carton, reached a high of $2.50 per carton from mid-March to April 23 and then dropped gradually to $1.33 in May as the price of strawberries fell. Apio paid Munoz $68,791 on May 12 for berries delivered the week ending May 7, in advance of the 21-day contractual due date for payment. The next Pick-Pack advance payments from Apio were due on June 2 for the week ending May 14, and on June 9 for the week ending May 21. Apio actually advanced Munoz $77,662 for both weeks sometime between June 8 and 10. Combs advanced Munoz $30,000 in the last five days of May. Munoz received no payments at all from Ramirez Brothers during the 2000 season. Munoz finished the season owing Apio about $80,000, Combs about $8,000, and Ramirez Brothers about $30,000.

Despite advances from Apio and Combs, and despite increasing payments from Frozsun, Munoz at some point in May 2000 began to have problems paying his workers. This led to a work stoppage on the afternoon of Saturday, May 27, in the El Campo field, where over 100 of Munoz's employees were harvesting freezer berries. Munoz's employees, who had apparently not been paid for several weeks, had stopped work and were talking with Jose Popoca Serrano, who identified himself as a member of the "Organization for Human Rights." Serrano was compiling a list, which he later gave to the Division of

Labor Standards Enforcement (DLSE), of workers claiming unpaid wages. Munoz's supervisor Arturo Leon, and Munoz himself by telephone, asked Serrano to help persuade the workers to return to work, telling Serrano that Munoz could not pay because Apio was withholding payment.[7] Munoz promised Serrano he would pay his workers on Tuesday. At some point, Combs's field representative Juan Ruiz arrived, telling Serrano he had a check payable to Munoz from Combs for $25,000 and that Munoz already had another $20,000. Ruiz then spoke directly to Munoz's workers. According to plaintiff Asuncion Cruz, "Juan [Ruiz] . . . told us to keep working and help Munoz. Juan told us not to worry and said he guaranteed we would be paid as his boss had checks he was delivering to Isidro Munoz." Cruz "heard workers tell Juan they were concerned that the amount of the check he brought with him would not be enough to pay everyone. Juan told us not to worry as he would deliver even larger amounts of money from his boss to Isidro Munoz the following week, and even more money the week after that, which would be enough to pay us all." Munoz's workers recognized Ruiz as the field representative for the company (Combs) to whom Munoz delivered fresh market berries from the El Campo field. According to Leon, Ruiz also spoke with individual workers, explaining that "if all of you stop right now, the strawberries are going to go to waste. And they won't be able to pay you." After Ruiz spoke, several workers crossed their names off Serrano's list and returned to work, but 75 workers left for the day to return on Monday.

On June 5, 2000, the DLSE began to investigate wage claims against Munoz, based on Serrano's information. The next day, DLSE investigator Paul Rodriguez met with Tim Murphy, Apio's vice-president, who said that a payment to Munoz of approximately $75,000 was pending. Rodriguez asked Murphy not to pay Munoz but, instead, to pay Munoz's employees directly. Murphy declined because Apio owed the money to Munoz, not his employees, and did not want to breach its agreement with Munoz. Subsequently, however, Apio and Munoz agreed, at the DSLE's suggestion, that Apio would pay Munoz, and that cashier's checks would immediately be issued in the names of the employees who had filed wage claims. Implementing this agreement on June 8 or 9, Murphy and Munoz visited Mid-State Bank & Trust in Guadalupe, where Murphy did business. Munoz endorsed Apio's check to the bank, and the bank issued checks to the workers named on a list Munoz provided. On June 10, Murphy delivered the checks to DLSE investigator Rodriguez at the Betteravia Government Center in Santa Maria. Rodriguez, a second DLSE investigator, and Munoz's foreman Arturo Leon

---

[7] The record does not support Munoz's statement to Serrano. As noted, as of May 27, 2000, Apio had already paid Munoz for the week ending May 7, ahead of the contractual 21-day due date. Apio's next payment would not come due until June 2.

distributed the checks to Munoz's employees. Murphy observed the distribution but did not participate.

On November 21, 2000, plaintiffs filed the present action against defendants Apio, Combs and Ruiz, as well as the now bankrupt Munoz. Plaintiffs asserted a variety of claims. Specifically, plaintiffs alleged defendants were liable for unpaid minimum wages (§ 1194), liquidated damages for unpaid minimum wages (§ 1194.2),[8] unpaid contract wages (§ 216), waiting time penalties (§ 203), penalties for failure to provide wage statements (§ 226), and breach of contract. On behalf of similarly situated employees, plaintiffs also alleged claims under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) (UCL) for restitution (*id.*, § 17203) and liquidated damages (Lab. Code, § 1194.2). Plaintiffs did not seek class certification.

Defendants Apio, Combs and Ruiz moved for summary judgment on all claims. Plaintiffs' opposition to the motions focused on three theories of liability. First, applying the definitions of "employ" and "employer" set out in Wage Order No. 14,[9] plaintiffs contended defendants Apio and Combs, together with Munoz, jointly employed plaintiffs and were thus liable under sections 1194 and 1194.2 for their unpaid wages and liquidated damages. Second, plaintiffs argued they were third party beneficiaries of the contract between Munoz and Apio, in which, among other things, Munoz agreed to comply with all applicable laws, including the labor laws. Third, plaintiffs asserted they were parties to an oral employment agreement with Combs.[10] The superior court rejected plaintiffs' arguments and granted judgment for defendants.

---

[8] The "liquidated damages" allowed in section 1194.2 are in effect a penalty equal to the amount of unpaid minimum wages.

[9] Under Wage Order No. 14, " 'Employ' means to engage, suffer, or permit to work," and " '[e]mployer' means any person as defined in Section 18 of the Labor Code, who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." (Cal. Code Regs., tit. 8, § 11140, subd. 2(C), (F).) Under Labor Code section 18, " '[p]erson' means any person, association, organization, partnership, business trust, limited liability company, or corporation."

The California Code of Regulations incorrectly designates section 2(F) of Wage Order No. 14 as subdivision 2(G) of title 8, section 11140. This opinion cites section 11140's subdivisions as if they were correctly numbered to conform to those of the wage order.

[10] Only these three claims remain pending. Plaintiffs have abandoned all others except for their claims under the UCL, which, as plaintiffs acknowledge, depend on the validity of the three claims mentioned above. The UCL claims are also subject to our holding in *Arias v. Superior Court* (2009) 46 Cal.4th 969, 980 [95 Cal.Rptr.3d 588, 209 P.3d 923], that private plaintiffs must ordinarily obtain class certification to represent others in UCL actions.

Plaintiffs appealed. The Court of Appeal affirmed in part and reversed in part. Finding no California case law interpreting the IWC's definitions of "employ" and "employer" (e.g., Wage Order No. 14, Cal. Code Regs., tit. 8, § 11140, subd. 2(C), (F)), the court imported the "economic reality" test for employment developed in federal cases interpreting the Fair Labor Standards Act of 1938. (29 U.S.C. § 201 et seq.; see *Goldberg v. Whitaker House Coop.* (1961) 366 U.S. 28, 33 [6 L.Ed.2d 100, 81 S.Ct. 933].) Applying that test, the court concluded defendants "did not exercise sufficient control over [plaintiffs,] and [over Munoz's] agricultural operation[,] to be [plaintiffs'] joint employers," and thus affirmed the summary judgment for defendants on plaintiffs' claims under Labor Code sections 1194 and 1194.2. The court also affirmed the summary judgment for Apio on plaintiffs' claim as purported third party beneficiaries of Apio's contract with Munoz. Finally, the court found triable issues of fact on plaintiffs' claim regarding the alleged oral agreement with Combs. The Court of Appeal reversed the judgment on this claim alone, and Combs did not seek review. In all other respects, the Court of Appeal affirmed.

We granted plaintiffs' petition for review and deferred further action pending consideration of a related issue in *Reynolds v. Bement* (2005) 36 Cal.4th 1075 [32 Cal.Rptr.3d 483, 116 P.3d 1162] (*Reynolds*).

## II. Discussion

### A. *Introduction.*

The central question before us is whether defendants are subject to suit by plaintiffs under section 1194.[11] The statute provides in relevant part as follows: "Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorney's fees, and costs of suit." (*Id.*, subd. (a).) The Legislature has thus given an employee a cause of action for unpaid minimum wages without specifying who is liable. That only an employer can be liable, however, seems logically inevitable as no generally applicable rule of law imposes on anyone other than an employer a duty to pay wages.

---

[11] Plaintiffs cannot recover liquidated damages under section 1194.2 unless they have a valid claim under section 1194. (See § 1194.2, subd. (a).) Accordingly, we will from this point on refer only to section 1194.

Plaintiffs' effort to recover unpaid wages from persons who contracted with their ostensible employer raises issues that have long avoided the attention of California's courts. The statute currently designated as section 1194, with its specific operative language, was enacted in 1913 as part of the act that created the IWC and delegated to it the power to fix minimum wages, maximum hours of work, and standard conditions of labor. (Stats. 1913, ch. 324, § 13, p. 637.) In the ensuing 97 years, however, we have touched only once upon the question of how employment should be defined in actions brought under section 1194. (*Reynolds, supra*, 36 Cal.4th 1075, 1085–1089.)[12] Similarly, the phrases the IWC presently uses to define the terms "employ" and "employer" in all 16 of its current industry and occupation wage orders (IWC wage orders Nos. 1-2001 to 16-2001, Cal. Code Regs., tit. 8, §§ 11010–11160) first appeared in orders dated 1916[13] and 1947,[14] respectively, yet the courts of this state have never considered their meaning or scope.[15] Likewise has the concept of joint employment avoided judicial scrutiny in the context of wage claims brought under state law. Although we have recognized that a person, by exercising significant control over the employees of another, may come to share the employer's legal obligations, our decisions on this point have concerned statutory schemes other than the wage laws.[16]

---

[12] As we explain below, *Reynolds, supra*, 36 Cal.4th 1075, spoke too broadly in concluding that the common law defines the employment relationship in actions under section 1194. (See, *post*, at p. 62 et seq.) The few lower court decisions addressing the definition of employment under section 1194 (*Bradstreet v. Wong* (2008) 161 Cal.App.4th 1440, 1449–1454 [75 Cal.Rptr.3d 253]; *Jones v. Gregory* (2006) 137 Cal.App.4th 798, 803–805 [40 Cal.Rptr.3d 581]) add nothing to our understanding of the problem because they postdate and thus necessarily follow *Reynolds*. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] [this court's decisions bind all lower courts].)

[13] IWC former wage order No. 1, "Fruit and Vegetable Canning Industry" (Feb. 29, 1916) sections 1 through 5 (IWC, approved minutes for Feb. 14, 1916, meeting).

[14] IWC former wage order No. 1R, "Wages, Hours, and Working Conditions for Women and Minors in the Manufacturing Industry" (June 1, 1947), section 2(f).

[15] The DLSE has devoted some attention to the wage orders' definition of employer in its published policies governing the enforcement of wage claims. (DLSE, Enforcement Policies and Interpretations Manual (Mar. 2006) §§ 2.2.1, 55.2 to 55.2.1.2.1.) However, we give the DLSE's current enforcement policies no deference because they were not adopted in compliance with the Administrative Procedure Act (Gov. Code, § 11340 et seq.). (*Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 581–582 [94 Cal.Rptr.2d 3, 995 P.2d 139]; *Tidewater Marine Western, Inc. v. Bradshaw* (1996) 14 Cal.4th 557, 575–577 [59 Cal.Rptr.2d 186, 927 P.2d 296].)

[16] For example, the Public Employees' Retirement Law (Gov. Code, § 20000 et seq.; see *Metropolitan Water Dist. v. Superior Court* (2004) 32 Cal.4th 491, 499–509 [9 Cal.Rptr.3d 857, 84 P.3d 966]); the Alatorre-Zenovich-Dunlap-Berman Agricultural Labor Relations Act of 1975 (§ 1140 et seq.; see *Rivcom Corp. v. Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 767–769 [195 Cal.Rptr. 651, 670 P.2d 305]); the California Fair Employment and Housing Act (Gov. Code, § 12900 et seq.; see *Bradley v. Department of Corrections & Rehabilitation* (2008)

■ How then do we define the employment relationship, and thus identify the persons who may be liable as employers, in actions under section 1194? The question is ultimately one of legislative intent, as "[o]ur fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) In this search for what the Legislature meant, "[t]he statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190 [48 Cal.Rptr.3d 108, 141 P.3d 225].)

### B. *The Parties' Arguments.*

The uncertainty surrounding the definition of the employment relationship in actions under section 1194 has led the parties to offer several diverse arguments. Those arguments, and our conclusions, may be summarized as follows:

Plaintiffs contend the language and history of section 1194 show the Legislature intended generally to defer to the IWC's regulatory definitions of the employment relationship in its wage orders. Plaintiffs would give those definitions sweeping breadth. Specifically, plaintiffs argue defendants "suffer[ed], or permit[ted plaintiffs] to work" (Wage Order No. 14, Cal. Code Regs., tit. 8, § 11140, subd. 2(C)), because defendants knew Munoz would need to hire workers to fulfill his contracts with defendants, and that defendants thus, in some sense, suffered or permitted plaintiffs to work for their benefit. Plaintiffs further argue defendants "exercise[d] control over [plaintiffs'] wages, hours, or working conditions" (Wage Order No. 14, Cal. Code Regs., tit. 8, § 11140, subd. 2(F)), because defendants, under the terms of their contracts with Munoz, controlled the remittance to him of his share of the proceeds of sale, and thus a portion of the income from which he paid his employees.

Defendants, in opposition, cite our decision in *Reynolds, supra,* 36 Cal.4th 1075, where we looked to the common law to define employment in a suit

158 Cal.App.4th 1612, 1625–1629 [71 Cal.Rptr.3d 222]); and the workers' compensation law (§ 3200 et seq.; see, e.g., *Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 174–175 [151 Cal.Rptr. 671, 588 P.2d 811]).

under section 1194 seeking to hold the directors and officers of a corporation liable for its employees' unpaid overtime compensation. (*Reynolds*, at pp. 1086–1087.) Alternatively, in the event *Reynolds* is distinguishable and the wage order's definitions do apply, defendants argue we should construe the wage order as if it incorporated the federal "economic reality" definition of employment developed in cases arising under the Fair Labor Standards Act of 1938 (29 U.S.C. § 201 et seq.; FLSA; see *Goldberg v. Whitaker House Coop.*, *supra*, 366 U.S. 28, 33) and articulated in federal regulations promulgated under the FLSA (see 29 C.F.R. § 791.2 (2009)) and the Migrant and Seasonal Agricultural Worker Protection Act (29 U.S.C. § 1801 et seq.; 29 C.F.R. § 500.20(h)(5) (2009)).[17]

■ We hold as follows: In actions under section 1194 to recover unpaid minimum wages, the IWC's wage orders do generally define the employment relationship, and thus who may be liable. An examination of the wage orders' language, history and place in the context of California wage law, moreover, makes clear that those orders do not incorporate the federal definition of employment. Applying these conclusions to the facts of the case, we affirm the Court of Appeal's judgment.

C. *Labor Code Section 1194.*

As noted at the outset, the Legislature has not, within the four corners of section 1194, either defined the employment relationship or identified the persons who are liable under the statute for unpaid wages. We thus turn for guidance to the statute's context and legislative history. Section 1194 is the direct successor of, and its operative language comes immediately from, section 13 of the uncodified 1913 act (Stats. 1913, ch. 324, § 13, p. 637) that created the IWC and delegated to it the power to fix minimum wages, maximum hours and standard conditions of labor for workers in California.[18] An examination of section 1194 in its statutory and historical context shows unmistakably that the Legislature intended the IWC's wage orders to define the employment relationship in actions under the statute.

---

[17] Plaintiffs disclaim any argument that defendants were their employers under federal or common law.

[18] Section 13 of the 1913 act provided: "Any employee receiving less than the legal minimum wage applicable to such employee shall be entitled to recover in a civil action the unpaid balance of the full amount of such minimum wage, together with costs of suit, notwithstanding any agreement to work for such lesser wage." (Stats. 1913, ch. 324, § 13, p. 637.)

Today, Labor Code section 1194, subdivision (a) (set out in full at p. 49, *ante*), differs from the original section 13 only in its coverage of all employees regardless of gender, thus repealing an implicit limitation of the 1913 act (Stats. 1973, ch. 1007, § 8, p. 2004; Stats. 1972, ch. 1122, § 13, p. 2156); in its provisions for overtime compensation (Stats. 1961, ch. 408, § 3, p. 1479), attorney fees and interest (Stats. 1991, ch. 825, § 2, p. 3666); and in the relocation of the original statute's final clause ("notwithstanding . . .") to the beginning (*ibid.*).

The act creating the IWC (the 1913 act) joined a wave of minimum wage legislation that swept the nation in the second decade of the 20th century. No state's law provided for a minimum wage before 1912. By the end of 1913, however, nine states had enacted such laws, motivated by widespread public recognition of the low wages, long hours, and poor working conditions under which women and children often labored. By 1919, another five states, the District of Columbia and Puerto Rico had followed. (Brandeis, *Labor Legislation: Minimum Wage Legislation* in 3 History of Labor in the United States 1896–1932 (Commons edit. 1935) pp. 501, 507 (Brandeis).) These states took a variety of approaches to the problem. For example, two states (Mass. and Neb.) enacted voluntary minimum wage laws, and one state (Utah) set a minimum wage by statute. Other states, including California, went much further by directing commissions to study labor conditions and to set minimum wages based on the cost of living, and by making the failure to pay the minimum wage a crime. (Brandeis, *supra*, at p. 502; Note, *Woman's Work* (1913) 3 Am. Lab. Legis. Rev. 433, 434–473.) These states did not follow a federal model,[19] as Congress would not enact the FLSA (29 U.S.C. § 201 et seq.) until 1938.

In California specifically, calls to enact a minimum wage followed 1911 legislation prohibiting some child labor and regulating the hours women and children could be required to work (Stats. 1911, chs. 116, 258 & 456, pp. 282, 437, 910), and a comprehensive 1912 report by the State Bureau of Labor Statistics on wages, hours and labor conditions throughout the state. The report showed, among other things, that approximately 40 percent of working women earned less than $9 per week. (State Bur. of Lab. Statistics, 15th Biennial Rep., 1911–1912 (1912) pp. 100–101, 458.) "Although interpretations of this evidence varied widely, most experts thought that these wages were unreasonably low. The bureau itself considered them below a decent standard of living—'many women were living below any normal standard, and . . . such subnormal living was having a most disastrous effect on the health and morals of the women workers.' " (Hundley, *supra*, 29 Pac. Hist. Rev. at pp. 272–273, fn. omitted, quoting IWC, What California Has Done to Protect the Women Workers (May 1927) p. 5.) Although the 1911 legislation had nearly eliminated unpermitted child labor, the bureau reported that minors from 12 to 16 years old working with permits still constituted just under 1 percent of the workforce. (State Bur. of Lab. Statistics, 15th Biennial Rep., *supra*, at pp. 21, 24.) The bureau did not report working minors' wages.

---

[19] California's minimum wage law was based on a proposal originally drafted by the National Consumers' League for use in Oregon. (Brandeis, in 3 History of Labor in the United States, *supra*, at p. 514; Hundley, *Katherine Philips Edson and the Fight for the California Minimum Wage, 1912–1923* (1960) 29 Pac. Hist. Rev. 271, 274 (Hundley).)

The 1913 Legislature addressed these continuing problems by creating the IWC and delegating to it broad authority to regulate the hours, wages and labor conditions of women and minors (Stats. 1913, ch. 324, p. 632), and by proposing to the voters a successful constitutional amendment confirming the Legislature's authority to proceed in that manner.[20] The argument in favor of the proposed constitutional amendment informed the voters that "[i]n 1911 bills were passed controlling the hours of women's and children's work, and it was obvious that the work was less than half done unless the other two minimum rules of industrial life were also made to protect this weakest and most helpless class: that is, that the safety and the sanitary conditions in which women worked should be controlled, and, what was more important, that they should be certain of a living wage—a wage that insures for them the necessary shelter, wholesome food and sufficient clothing." (Ballot Pamp., Gen. Elec. (Nov. 3, 1914) argument in favor of Assem. Const. Amend. No. 90, p. 29.) On this point, the ballot pamphlet cited the findings of the State Bureau of Labor Statistics and expressed concern that substandard wages frequently led to ill health and moral degeneracy. (*Ibid.*)

The IWC's initial statutory duty under the 1913 act was to "ascertain the wages paid, the hours and conditions of labor and employment in the various occupations, trades, and industries in which women and minors are employed in the State of California, and to make investigations into the comfort, health, safety and welfare of such women and minors." (Stats. 1913, ch. 324, § 3, subd. (a), p. 633.) To assist the IWC in this work, the Legislature gave the commission broad investigatory powers, including free access to places of business and employment (*id.*, § 3, subd. (b), par. 2, p. 633), as well as the authority to demand reports and information under oath (*id.*, § 3, subd. (b), par. 1, p. 633), to inspect records (*id.*, § 3, subd. (b), par. 2, p. 633), and to issue subpoenas requiring the appearance and sworn testimony of witnesses (*id.*, § 4, pp. 633–634). If, after investigation, the IWC determined that the wages paid to women and minors in any industry were "inadequate to supply the cost of proper living, or the hours or conditions of labor [were] prejudicial to the health, morals or welfare of the workers," the IWC was to convene a

---

[20] Former article XX, section 17 1/2, of the California Constitution provided: "The legislature may, by appropriate legislation, provide for the establishment of a minimum wage for women and minors and may provide for the comfort, health, safety and general welfare of any and all employees. No provision of this constitution shall be construed as a limitation upon the authority of the legislature to confer upon any commission now or hereafter created, such power and authority as the legislature may deem requisite to carry out the provisions of this section." (Added by Assem. Const. Amend. No. 90 (1913 Reg. Sess.), as approved by voters (Prop. 44), Gen. Elec. (Nov. 3, 1914).)

Today, article XIV, section 1, of the California Constitution declares on the same point that "[t]he Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission legislative, executive, and judicial powers." (Added by Assem. Const. Amend. No. 40 (1975–1976 Reg. Sess.), as approved by voters (Prop. 14), Primary Elec. (June 8, 1976).)

" 'wage board' " of employers and employees. (*Id.*, § 5, p. 634.) Based on the wage board's report and recommendations, and following a public hearing, the commission was to issue wage orders fixing for each industry "[a] minimum wage to be paid to women and minors . . . adequate to supply . . . the necessary cost of proper living and to maintain [their] health and welfare" (*id.*, § 6, subd. (a), par. 1, p. 634), the maximum hours of work, and the standard conditions of labor (*id.*, subd. (a), pars. 2–3, pp. 634–635).

Today, the laws defining the IWC's powers and duties remain essentially the same as in 1913,[21] with a few important exceptions: First, the voters have amended the state Constitution to confirm the Legislature's authority to confer on the IWC *"legislative, executive, and judicial powers."* (Cal. Const., art. XIV, § 1, italics added [added by Assem. Const. Amend. No. 40 (1975–1976 Reg. Sess.), as approved by voters (Prop. 14), Primary Elec. (June 8, 1976)]; see *Industrial Welfare Com. v. Superior Court* (1980) 27 Cal.3d 690, 701 [166 Cal.Rptr. 331, 613 P.2d 579].) Second, the Legislature has expanded the IWC's jurisdiction to include all employees, male and female, in response to federal legislation barring employment discrimination because of sex (tit. VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.). (See Stats. 1973, ch. 1007, § 8, p. 2004; Stats. 1972, ch. 1122, § 13, p. 2156; see generally *Industrial Welfare Com. v. Superior Court, supra*, at pp. 700–701.) Third, "while retaining the authorizing language of [the 1913 act]," the Legislature has "restated the commission's responsibility in even broader terms" (*Industrial Welfare Com. v. Superior Court, supra*, at pp. 701–702), charging the IWC with the "continuing duty" to ascertain the wages, hours and labor conditions of "all employees in this state," to "investigate [their] health, safety, and welfare," to "conduct a full review of the adequacy of the minimum wage at least once every two years" (Lab. Code, § 1173), and to convene wage boards and adopt new wage orders if the commission finds "that wages paid to employees may be inadequate to supply the cost of proper living" (*id.*, § 1178.5, subd. (a); see also *id.*, § 1182). Finally, while the amount of the minimum wage has in recent years been set by statute (e.g., *id.*, §§ 1182.11, 1182.12), specific employers and employees still become subject to the minimum wage only through, and under the terms of, the IWC's applicable wage orders (*id.*, § 1197).[22]

---

[21] See, e.g., sections 1173 (duties of IWC), 1174–1174.5 (records and inspections), 1176 (witnesses and subpoenas), 1178–1180 (wage boards), 1181 (hearings), 1182 (wage orders).

[22] Section 1197 provides that "[t]he minimum wage for employees fixed by the commission is the minimum wage to be paid to employees, and the payment of a less wage than the minimum so fixed is unlawful." Consistently with section 1197, legislative acts setting the minimum wage have taken effect through a general wage order modifying all others to incorporate the current amount. (E.g., IWC wage order No. MW-2007; Cal. Code Regs., tit. 8, § 11000.)

To ensure the IWC's wage orders would be obeyed, the Legislature included criminal, administrative and civil enforcement provisions in the original 1913 act. The criminal enforcement provision declared that employers who failed to pay the minimum wage, as well as officers, agents and other persons acting for such employers, would be guilty of misdemeanors. (Stats. 1913, ch. 324, § 11, p. 636.) The administrative provision authorized the IWC to "take all proceedings necessary to enforce" payment of the minimum wage based on complaints filed by underpaid employees. (*Id.*, § 14, p. 637.) The civil provision—the immediate predecessor of Labor Code section 1194—gave employees a private right of action to recover unpaid minimum wages and invalidated agreements to work for less than the minimum wage. (Stats. 1913, ch. 324, § 13, p. 637, quoted, *ante*, p. 52, fn. 18.) More robust versions of these enforcement provisions appear in today's Labor Code. (See §§ 1193.5 [administrative enforcement], 1193.6, 1194, 1194.2 [civil actions], 1199 [criminal liability].)

The 1913 act did not give any employee the immediate right to receive a minimum wage. Instead, the Legislature provided that implementation and enforcement of the minimum wage would depend upon, and await, the IWC's issuance of wage orders governing specific industries and occupations. This was the effect of section 11 of the 1913 act, which provided that "[t]he minimum wage for women and minors fixed by said commission as in this act provided, shall be the minimum wage to be paid to such employees, and the payment to such employees of a less wage than the minimum so fixed shall be unlawful . . . ." (Stats. 1913, ch. 324, § 11, p. 636.) Accordingly, the essential predicate of each employer's obligation to pay a minimum wage was the IWC's issuance of an applicable wage order fixing the minimum wage for a particular industry or occupation. The applicable wage order also provided the necessary legal basis for an action by an employee to recover unpaid minimum wages. Section 13 of the 1913 act, the original civil liability provision, permitted "[a]ny employee receiving less than *the legal minimum wage applicable to such employee* . . . to recover in a civil action the unpaid balance of the full amount of such minimum wage . . . ." (Stats. 1913, ch. 324, § 13, p. 637, italics added.) The italicized phrase unambiguously referred to the wage mandated by the terms of the applicable wage order, because section 11 defined the wage "fixed by said commission" as "the minimum wage to be paid" and its nonpayment as "unlawful." (Stats. 1913, ch. 324, § 11, p. 636.)

Virtually the same statutory and regulatory structure remains in place today. Under section 1197, "[t]he minimum wage for employees fixed by the commission is the minimum wage to be paid to employees, and the payment of a less wage than the minimum so fixed is unlawful." Under section 1194, "any employee receiving less than the legal minimum wage . . . applicable to the employee is entitled to recover in a civil action the unpaid balance of the

full amount of this minimum wage . . ." (*id.*, subd. (a)). Accordingly, today, as under the 1913 act, specific employers and employees become subject to the minimum wage only under the terms of an applicable wage order, and an employee who sues to recover unpaid minimum wages actually and necessarily sues to enforce the wage order.

The newly created IWC moved diligently to exercise its broad delegated powers. After investigating labor conditions in the fruit and vegetable canning industry, the commission convened the first wage board in 1916 and later that year issued its first wage order (IWC former wage order No. 1; see p. 50, fn. 13, *ante*), making women and minors working in that industry the first employees in California to receive a legally established minimum wage. By the end of 1918, the commission had issued additional orders establishing minimum wages in the mercantile, laundry, fish canning, fruit and vegetable packing, and manufacturing industries, and in general and professional office occupations. (IWC, Third Biennial Rep. (1919) pp. 9–11.) Today 18 wage orders are in effect, 16 covering specific industries and occupations,[23] one covering all employees not covered by an industry or occupation order,[24] and a general minimum wage order amending all others to conform to the amount of the minimum wage currently set by statute.[25]

D. *How the IWC Has Defined the Employment Relationship.*

The IWC's first wage order, adopted in 1916, contained no separate definition of the term "employ," but various substantive provisions imposing duties on employers began with language like that the IWC still uses today in all of its industry and occupation wage orders to define the term. For example: "No person, firm or corporation *shall employ or suffer or permit* any woman or minor to work in the fruit and vegetable canning industry in any occupation at time rates less than the following . . . ." (IWC former wage order No. 1, § 2, italics added; see, e.g., Wage Order No. 14, Cal. Code Regs., tit. 8, § 11140, subd. 2(C) [" 'Employ' means *to engage, suffer, or permit to work*" (italics added)].) The chosen language was especially apt in an order intended to regulate the employment of women and minors because it was already in use throughout the country in statutes regulating and prohibiting child labor (and occasionally that of women),[26] having been recommended

---

[23] IWC wage orders Nos. 1-2001 to 16-2001 (Cal. Code Regs., tit. 8, §§ 11010–11160).

[24] IWC wage order No. 17-2001, "Miscellaneous Employees" (Cal. Code Regs., tit. 8, § 11170).

[25] IWC wage order No. MW-2007 (see Cal. Code Regs., tit. 8, § 11000; see, *ante*, at p. 55, fn. 22).

[26] Of the many decisions applying such statutes before 1916, some of the most notable include *Curtis & Gartside Co. v. Pigg* (1913) 39 Okla. 31 [134 P. 1125, 1128–1129]; *Pinoza v. Northern Chair Co.* (1913) 152 Wis. 473 [140 N.W. 84, 86]; *Purtell v. Philadelphia & Reading*

for that purpose in several model child labor laws published between 1904 and 1912 (see *Rutherford Food Corp. v. McComb* (1947) 331 U.S. 722, 728, fn. 7 [91 L.Ed. 1772, 67 S.Ct. 1473]). The language had been interpreted to impose criminal liability for employing children, or civil liability for their industrial injuries, even when no common law employment relationship existed between the minor and the defendant, based on the defendant's failure to exercise reasonable care to prevent child labor from occurring.

Not requiring a common law master and servant relationship, the widely used "employ, suffer or permit" standard reached irregular working arrangements the proprietor of a business might otherwise disavow with impunity. Courts applying such statutes before 1916 had imposed liability, for example, on a manufacturer for industrial injuries suffered by a boy hired by his father to oil machinery (*Curtis & Gartside Co. v. Pigg, supra*, 134 P. 1125, 1127), and on a mining company for injuries to a boy paid by coal miners to carry water (*Purtell v. Philadelphia & Reading Coal & Iron Co., supra*, 99 N.E. 899, 900–901).

Results such as these, while foreign to the common law, were generally understood as appropriate under child labor statutes that included the "employ, suffer or permit" standard. As one state supreme court explained, "[i]f the statute went no farther than to prohibit employment, then it could be easily evaded by the claim that the child was not employed to do the work which caused the injury, but that he did it of his own choice and at his own risk; and if it prohibited only the *employment* and *permitting* a child to do such things, then it might still be evaded by the claim that he was not employed to do such work, nor was permission given him to do so. But the statute goes farther, and makes use of a term even stronger than the term '*permitted.*' It says that he shall be neither employed, permitted, nor *suffered* to engage in certain works." (*Curtis & Gartside Co. v. Pigg, supra*, 134 P. 1125, 1129.) The standard thus meant that the employer "shall not *employ* by contract, nor shall he *permit* by acquiescence, nor *suffer* by a failure to hinder." (*Ibid.*) Similarly, another state supreme court rejected the employer's argument that the standard could "only apply when the relation of master and servant actually exists." (*Purtell v. Philadelphia & Reading Coal & Iron Co., supra*, 99 N.E. 899, 902.) "To put [such a] construction on this statute . . . would leave the words 'permitted or suffered to work' practically without meaning. It is the child's working that is forbidden by the statute, and not his hiring, and, while the statute does not require employers to police their premises in order to prevent chance violations of the act, they owe the duty of

*Coal & Iron Co.* (1912) 256 Ill. 110 [99 N.E. 899, 902]; *Casperson v. Michaels* (1911) 142 Ky. 314 [134 S.W. 200, 201]; *State v. Rose* (1910) 125 LA. 462 [51 So. 496, 497]; and *Commonwealth v. Beatty* (1900) 15 Pa.Super. 5.

using reasonable care to see that boys under the forbidden age are not suffered or permitted to work there contrary to the statute." (*Ibid.*)

The IWC's separate definition of "employer" (i.e., a person who "employs or exercises control over the wages, hours, or working conditions of any person")[27] is only relatively recent, having first appeared in a 1947 order regulating the manufacturing industry.[28] The same language appears today in all 16 of the IWC's industry and occupation orders. Beginning with the word "employs," the definition logically incorporates the separate definition of "employ" (i.e., "to engage, suffer, or permit to work") as one alternative. The remainder of the definition—"exercises control over . . . wages, hours, or working conditions"—has no clearly identified, precisely literal statutory or common law antecedent. About this language, however, one may safely make three observations:

■ First, the scope of the IWC's delegated authority is, and has always been, over wages, hours and working conditions. (§§ 1173, 1178.5; see Stats. 1913, ch. 324, §§ 3, 5 & 6, pp. 633–635.) For the IWC to adopt a definition of "employer" that brings within its regulatory jurisdiction an entity that controls any one of these aspects of the employment relationship makes eminently good sense.

Second, phrased as it is in the alternative (i.e., "wages, hours, *or* working conditions"),[29] the language of the IWC's "employer" definition has the obvious utility of reaching situations in which multiple entities control different aspects of the employment relationship, as when one entity, which hires and pays workers, places them with other entities that supervise the work. Consistently with this observation, the IWC has explained its decision to include the language in one modern wage order as "specifically intended to include both temporary employment agencies and employers who contract with such agencies to obtain employees within the definition of 'employer.' "[30]

Third, and finally, the IWC's "employer" definition belongs to a set of revisions intended to distinguish state wage law from its federal analogue, the FLSA. We touched upon this point in *Morillion v. Royal Packing Co., supra,* 22 Cal.4th 575. In 1947, Congress limited the FLSA by enacting the Portal-to-Portal Act of 1947 (29 U.S.C. § 252 et seq.), which relieved employers of the obligation to compensate employees for time spent travelling to the worksite, even in an employer's vehicle, and for time spent in

---

[27] Wage Order No. 14 (Cal. Code Regs., tit. 8, § 11140, subd. 2(F)).

[28] IWC former wage order No. 1R, "Wages, Hours, and Working Conditions for Women and Minors in the Manufacturing Industry" (June 1, 1947) section 2(f).

[29] Wage Order No. 14 (Cal. Code Regs., tit. 8, § 11140, subd. 2(F), italics added).

[30] IWC, Statement as to the Basis for Wage Order No. 16 Regarding Certain On-site Occupations in the Construction, Drilling, Mining, and Logging Industries (Jan. 2001) page 5.

activities "preliminary to or postliminary" to work (*id.*, § 254(a)(2)). In response, the IWC, exercising its authority to provide employees with greater protection than federal law affords (*Morillion v. Royal Packing Co.*, *supra*, at p. 592; see also *Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785, 795 [85 Cal.Rptr.2d 844, 978 P.2d 2]), revised its wage orders from 1947 forward to define the term "hours worked" as meaning "the time during which an employee is *subject to the control of an employer*, . . . includ[ing] all the time the employee is suffered or permitted to work, whether or not required to do so."[31] At the same time, the IWC defined "employer" as meaning "any person . . . who directly or indirectly, or through an agent or any other person, employs *or exercises control* over the wages, hours, or working conditions of [an employee]."[32] Noting this history, defendant Combs argues the IWC's 1947 changes were intended solely to expand the definition of "hours worked" and not also to affect the definition of "employer." This is plainly wrong, as the IWC could have redefined "hours worked" without also redefining "employer." One change did not logically compel the other.

E. *Judicial Deference to the IWC's Orders.*

■ The Legislature and the voters have repeatedly demanded the courts' deference to the IWC's authority and orders. In the original 1913 act, the Legislature narrowly confined the scope of judicial review of the commission's orders, making its findings of fact conclusive in the absence of fraud and declaring that the minimum wage fixed by the commission was "presumed to be reasonable and lawful." (Stats. 1913, ch. 324, § 12, p. 636; see now Lab. Code, §§ 1185 [IWC's orders "shall be valid and operative"], 1187 [IWC's findings of fact are conclusive in the absence of fraud].) At the same time, as noted, the Legislature enacted and successfully proposed to the voters a constitutional amendment approving the IWC's creation and providing that no part of the state Constitution would be construed as limiting the Legislature's authority in the matter. (Cal. Const., former article XX, section 17 1/2; see, *ante*, at p. 54, fn. 20.) The ballot argument in favor of the measure explained the Assembly had proposed the amendment "to make sure that after the commission's work is done, its findings and rulings can not be assailed and made useless by the state courts declaring this [the 1913] act unconstitutional." (Ballot Pamp., *supra*, argument in favor of Assem. Const. Amend. No. 90, p. 29.) In 1949, the Legislature provided that the IWC's orders "shall be valid and operative" and exempt from the Administrative Procedure Act (Gov. Code, § 11340 et seq.). (Lab. Code, § 1185; Stats. 1949, ch. 1454, § 12, p. 2538, as amended.) In 1976, as noted, the voters again

---

[31] IWC former wage order No. 1R, section 2(h), italics added; see, e.g., Wage Order No. 14 (Cal. Code Regs., tit. 8, § 11140, subd. 2(G)).

[32] IWC former wage order No. 1R, italics added; see, e.g., Wage Order No. 14 (Cal. Code Regs., tit. 8, § 11140, subd. 2(F)).

amended the Constitution to confirm in even stronger terms that "[t]he Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission *legislative, executive, and judicial powers.*" (Cal. Const., art. XIV, § 1, italics added; see, *ante*, p. 54, fn. 20; see generally *Industrial Welfare Com. v. Superior Court, supra,* 27 Cal.3d 690, 701.)

Obeying these formal expressions of legislative and voter intent, the courts have shown the IWC's wage orders extraordinary deference, both in upholding their validity and in enforcing their specific terms. Concerning the wage orders' validity, "[j]udicial authorities have repeatedly emphasized that in fulfilling its broad statutory mandate, the IWC engages in a quasi-legislative endeavor, a task which necessarily and properly requires the commission's exercise of a considerable degree of policy-making judgment and discretion." (*Industrial Welfare Com. v. Superior Court, supra,* 27 Cal.3d 690, 702.) "Because of the quasi-legislative nature of the IWC's authority, the judiciary has recognized that its review of the commission's wage orders is properly circumscribed. . . . 'A reviewing court does not superimpose its own policy judgment upon a quasi-legislative agency in the absence of an arbitrary decision . . . .' " (*Ibid.,* quoting *Rivera v. Division of Industrial Welfare* (1968) 265 Cal.App.2d 576, 594 [71 Cal.Rptr. 739]) "Moreover, past decisions . . . teach that in light of the remedial nature of the legislative enactments authorizing the regulation of wages, hours and working conditions for the protection and benefit of employees, the statutory provisions are to be liberally construed with an eye to promoting such protection." (*Industrial Welfare Com. v. Superior Court, supra,* at p. 702.)

■ Concerning the specific terms of wage orders, we have explained that "[t]he power to fix [the minimum] wage does not confine the [IWC] to that single act. It may adopt rules to make it effective." (*Cal. Drive-in Restaurant Assn. v. Clark* (1943) 22 Cal.2d 287, 303 [140 P.2d 657], italics added.) "The power to provide safeguards to insure the receipt of the minimum wage and to prevent evasion and subterfuge, is necessarily an implied power flowing from the power to fix a minimum wage delegated to the commission. [¶] It is true that an administrative agency may not, under the guise of its rule making power, abridge or enlarge its authority or exceed the powers given to it by the statute, the source of its power. [Citations.] However, 'the authority of an administrative board or officer . . . to adopt reasonable rules and regulations which are deemed necessary to the due and efficient exercise of the powers expressly granted cannot be questioned. This authority is implied from the power granted.' " (*Id.,* at pp. 302–303, quoting *Bank of Italy v. Johnson* (1926) 200 Cal. 1, 20 [251 P. 784].)

■ Consistently with these deferential principles of review, we have repeatedly enforced definitional provisions the IWC has deemed necessary, in

the exercise of its statutory and constitutional authority (§ 1173; Cal. Const., art. XIV, § 1), to make its wage orders effective, to ensure that wages are actually received, and to prevent evasion and subterfuge. (*Cal. Drive-in Restaurant Assn. v. Clark, supra,* 22 Cal.2d 287, 302–303.) Such provisions have, for example, excluded restaurant servers' tips from the legal minimum wage (*id.,* at p. 290); defined " '[h]ours worked' " as including "the time during which an employee is subject to the control of an employer," even if travelling on the employer's bus and not actually working (e.g., Wage Order No. 14, Cal. Code Regs., tit. 8, § 11140, subd. 2(G); see *Morillion v. Royal Packing Co., supra,* 22 Cal.4th 575, 581–595); and required that an " '[o]ut-side salesperson,' " to be exempt from overtime compensation,[33] must "regularly work[] more than half the working time away from the employer's place of business" in sales activities (IWC wage order No. 7-2001, Cal. Code Regs., tit. 8, § 11070, subd. (2)(J); see *Ramirez v. Yosemite Water Co., supra,* 20 Cal.4th 785, 794–803). Such provisions constitute valid exercises of the IWC's authority because, and to the extent, they have "a direct relation to minimum wages" (*Cal. Drive-in Restaurant Assn. v. Clark, supra,* at p. 302) and are reasonably necessary to effectuate the purposes of the statute (see *Ramirez v. Yosemite Water Co., supra,* 20 Cal.4th 785, 800; see also *Cal. Drive-in Restaurant Assn. v. Clark, supra,* at p. 302). Courts must enforce such provisions in wage actions because, as we have explained, an employee who sues to recover unpaid minimum wages under section 1194 actually sues to enforce the applicable wage order. Only by deferring to wage orders' definitional provisions do we truly apply section 1194 according to its terms by enforcing the "legal minimum wage" (*id.,* subd. (a)).

F. *The Significance of* Reynolds, supra, *36 Cal.4th 1075*

Against this background we consider the significance of *Reynolds, supra,* 36 Cal.4th 1075, and whether that decision governs this case. In *Reynolds* we looked to the common law rather than the applicable wage order to define employment in an action under section 1194 seeking to hold a corporation's directors and officers personally liable for its employees' unpaid overtime compensation. (*Reynolds,* at pp. 1086–1088.) We conclude *Reynolds* does not govern this case. Wage Order No. 14, and not the common law, properly defines the employment relationship in this action under section 1194.

The plaintiff in *Reynolds, supra,* 36 Cal.4th 1075, worked for a corporation that owned and operated automobile painting shops. He sued under section 1194 to recover unpaid overtime compensation allegedly due him under the IWC's applicable wage order. The plaintiff named as the defendants, in addition to the corporation, eight of its officers and directors in their

---

[33] Since 1961, section 1194 has provided a civil remedy for unpaid overtime compensation on the same terms as unpaid minimum wages. (Stats. 1961, ch. 408, § 3, p. 1479.)

individual capacities. The question before us on demurrer was whether the plaintiff had stated a cause of action against the individual defendants. We held he had not. (*Reynolds, supra,* 36 Cal.4th 1075, 1083, 1087–1088.)

We properly began our analysis in *Reynolds, supra,* 36 Cal.4th 1075, 1086, by looking "to the IWC's intent in promulgating the employer definition." The applicable wage order defined "employer" in precisely the same language as all of the commission's other industry and occupation orders. Thus, "employer" meant "any person . . . who directly or indirectly, or through an agent or any other person, employs or exercises control over the wages, hours, or working conditions of any person." (IWC wage order No. 9-2001, Cal. Code Regs., tit. 8, § 11090, subd. 2(F).) Reasoning that "[t]he best indicator of [the commission's] intent is the language of the provision itself" (*Reynolds,* at p. 1086), we accepted the plaintiffs' concession that "the plain language of Wage Order No. 9 defining employer does not expressly impose liability under section 1194 on individual corporate agents" (*Reynolds,* at p. 1086).[34] This reasoning sufficed to dispose of the *Reynolds* plaintiff's claim because, as we have explained, a claim under section 1194 is in reality a claim under the applicable wage order and thus subject to the order's definitional provisions.

Nevertheless, we went on in *Reynolds, supra,* 36 Cal.4th 1075, 1086–1087, to state that the common law rather than the applicable wage order defined the employment relationship for purposes of the plaintiff's action under section 1194. We reached this conclusion in two steps: First, we rejected the suggestion that the Legislature had intended "to incorporate" the IWC's definitions into section 1194. (*Reynolds,* at p. 1086.) Second, we applied the maxim of interpretation that "[a] statute will be construed in light of the common law unless the Legislature ' " 'clearly and unequivocally' " ' indicates otherwise." (*Ibid.,* quoting *California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 297 [65 Cal.Rptr.2d 872, 940 P.2d 323].) Elaborating on the latter point, we explained that when " 'a statute refer[s] to employees without defining the term . . . courts have generally applied the common law test of employment.' " (*Reynolds,* at p. 1087, quoting *Metropolitan Water Dist. v. Superior Court, supra,* 32 Cal.4th 491, 500.) In a footnote, we added that the "plaintiff . . . ha[d] not persuaded us that one may infer from the history and purposes of section 1194 a clear legislative intent to depart, in the application of that statute, from the common law understanding of who qualifies as an employer." (*Reynolds,* at p. 1087, fn. 8.)

---

[34] While the DLSE had interpreted the IWC's wage orders as sometimes imposing personal liability on corporate agents, we accorded that interpretation no deference because it was embodied in enforcement policies the department had not adopted in compliance with the Administrative Procedure Act (Gov. Code, § 11340 et seq.). (*Reynolds, supra,* 36 Cal.4th 1075, 1088; see *Tidewater Marine Western, Inc. v. Bradshaw, supra,* 14 Cal.4th 557, 576–577.)

■ As we have now shown, an examination of section 1194 in its full historical and statutory context shows unmistakably that the Legislature intended to defer to the IWC's definition of the employment relationship in actions under the statute. The Legislature has delegated to the IWC broad authority over wages, hours and working conditions (§ 1173 et seq.), the voters have repeatedly ratified that delegation (Cal. Const., art. XIV, § 1; see *id.*, former art. XX, § 17 1/2), and we have confirmed that "[t]he power to fix [the minimum] wage does not confine the [IWC] to that single act. It may adopt rules to make it effective" (*Cal. Drive-in Restaurant Assn. v. Clark, supra,* 22 Cal.2d 287, 303). The power to adopt rules to make the minimum wage effective includes the power to define the employment relationship as necessary "to insure the receipt of the minimum wage and to prevent evasion and subterfuge . . . ." (*Id.,* at p. 302.) Finally, as we have explained, a worker who sues under section 1194 for unpaid minimum wages actually sues to enforce the applicable wage order. This is because the "legal minimum wage" recoverable under section 1194 *is* "[t]he minimum wage . . . fixed by the commission" (§ 1197) in the applicable wage order, even if that order merely incorporates the amount currently set by statute, and because employers and employees become subject to the minimum wage only through the applicable wage order and according to its terms (§ 1197; see, *ante,* at pp. 55–57 & fn. 22).

This is not to say the common law plays no role in the IWC's definition of the employment relationship. In fact, the IWC's definition of employment incorporates the common law definition *as one alternative.* As defined in the wage orders, " '[e]mployer' means any person . . . who . . . *employs* or exercises control over the wages, hours, or working conditions of any person," and " '[e]*mploy'* means to *engage,* suffer, or permit to work." (Wage Order No. 14, Cal. Code Regs., tit. 8, § 11140, subd. 2(C), (F), italics added.) The verbs "to suffer" and "to permit," as we have seen, are terms of art in employment law. (See, *ante,* at p. 57 et seq.) In contrast, the verb "to engage" has no other apparent meaning in the present context than its plain, ordinary sense of "to employ," that is, to create a common law employment relationship.[35] This conclusion makes sense because the IWC, even while extending its regulatory protection to workers whose employment status the common law did not recognize, could not have intended to withhold protection from the regularly hired employees who undoubtedly comprise the vast majority of the state's workforce. To employ, then, under the IWC's definition, has three alternative definitions. It means: (a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship.

---

[35] (See, e.g., Black's Law Dict. (8th ed. 2004) p. 570, col. 1 ["engage, *vb.* To employ . . ." (boldface omitted)].)

 While the common law definition of employment plays an important role in the wage orders' definition, and thus also in actions under section 1194, to apply only the common law definition while ignoring the rest of the IWC's broad regulatory definition would substantially impair the commission's authority and the effectiveness of its wage orders. The commission, as noted, has the power to adopt rules to make the minimum wage "effective" by "prevent[ing] evasion and subterfuge . . . ." (*Cal. Drive-in Restaurant Assn. v. Clark*, *supra*, 22 Cal.2d 287, 303, 302.) We have repeatedly upheld the commission's exercise of this authority. (See, *ante*, at p. 61 et seq.) Furthermore, language consistently used by the IWC to define the employment relationship, beginning with its first wage order in 1916 ("suffer, or permit"),[36] was commonly understood to reach irregular working arrangements that fell outside the common law, having been drawn from statutes governing child labor and occasionally that of women. (See, *ante*, at p. 57 et seq.) For the IWC, created as it was to regulate the employment of women and minors, to use this language to define the employment relationship was thus uniquely appropriate. To adopt such a definitional provision also lay squarely within the IWC's power, as the provision has "a direct relation to minimum wages" (*Cal. Drive-in Restaurant Assn. v. Clark*, *supra*, at p. 302) and is reasonably necessary to effectuate the purposes of the statute (see *Ramirez v. Yosemite Water Co.*, *supra*, 20 Cal.4th 785, 800; see also *Cal. Drive-in Restaurant Assn. v. Clark*, *supra*, at p. 302). For a court to refuse to enforce such a provision in a presumptively valid wage order (§ 1185) simply because it differs from the common law would thus endanger the commission's ability to achieve its statutory purposes.

One cannot overstate the impact of such a holding on the IWC's powers. Were we to define employment exclusively according to the common law in civil actions for unpaid wages we would render the commission's definitions effectively meaningless. Concerned about such a result, we suggested in *Reynolds*, *supra*, 36 Cal.4th 1075, 1088–1089, that the IWC's definitions might still play a role in administrative proceedings to recover unpaid minimum wages (i.e., "Berman" hearings). (See § 98 et seq.; Cal. Code Regs., tit. 8, § 13501 et seq.) Since *Reynolds*, however, the Court of Appeal has correctly observed that "[t]he distinction [between judicial and administrative proceedings] may be an empty one, since Berman hearings are reviewed de novo in superior court at [the] request of either party." (*Jones v. Gregory*, *supra*, 137 Cal.App.4th 798, 806.) The statutory trial de novo (see § 98.2) "is neither a conventional appeal nor review of the Labor Commissioner's decision, but is rather a de novo trial of the wage dispute" (*Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1116 [56 Cal.Rptr.3d 880, 155 P.3d 284]), and the court " 'hears the matter, not as an appellate court,

---

[36] IWC former wage order No. 1, section 2; see, e.g., Wage Order No. 14 (Cal. Code Regs., tit. 8, § 11140, subd. 2(C)).

but as a court of original jurisdiction, with full power to hear and determine it *as if it had never been before the labor commissioner* " (*id.*, at pp. 1116–1117, quoting *Collier & Wallis, Ltd. v. Astor* (1937) 9 Cal.2d 202, 205 [70 P.2d 171], italics added). In such a trial, a rule requiring courts in wage cases to define employment according to the common law (i.e., *Reynolds*) would presumably apply, leaving the IWC's definitions ultimately unenforceable even in proceedings that begin as Berman hearings.

In sum, we hold that the applicable wage order's definitions of the employment relationship do apply in actions under section 1194. The opinion in *Reynolds*, *supra*, 36 Cal.4th 1075, properly holds that the IWC's definition of "employer" does not impose liability on individual corporate agents acting within the scope of their agency. (*Reynolds*, at p. 1086.) The opinion should not be read more broadly than that.

### G. The IWC's Definition of the Employment Relationship Does Not Incorporate Federal Law.

With this background, we may easily dispose of defendants' argument that the IWC's wage orders should be construed as if their provisions defining the employment relationship incorporated federal law. They do not.

In no sense is the IWC's definition of the term "employ" based on federal law. As we have explained, the IWC has used the phrase "suffer or permit" in wage orders to define the employment relation since 1916,[37] borrowing the phrase from the common, well-understood wording of contemporary child labor laws. (See, *ante*, at p. 57 et seq.) Not until 1938 did Congress enact the FLSA, defining the term "employ" with similar language (29 U.S.C. § 203(g), added by 52 Stat. 1060, § 3),[38] and not until 1961 did the United States Supreme Court engraft onto the language of the FLSA the nonstatutory "economic reality" test for employment. (*Goldberg v. Whitaker House Coop.*, *supra*, 366 U.S. 28, 33.) Moreover, the federal test has uniquely federal antecedents. While the high court in 1961 was aware the phrase "suffer or permit" (29 U.S.C. § 203(g)) had been widely used in state child labor laws (see *Rutherford Food Corp. v. McComb*, *supra*, 331 U.S. 722, 728 & fn. 7), the court derived the "economic reality" test not from that body of law but rather from the language of a judicial decision defining employment for purposes of the federal tax and Social Security laws (*United States v. Silk* (1947) 331 U.S. 704, 713 [91 L.Ed. 1757, 67 S.Ct. 1463]), which in turn relied on a decision interpreting the National Labor Relations Act (29 U.S.C. § 151 et seq.; *Board v. Hearst Publications* (1944) 322 U.S. 111, 127–128

---

[37] IWC former wage order No. 1, sections 1 through 5; see, e.g., Wage Order No. 14 (Cal. Code Regs., tit. 8, § 11140, subd. 2(C)).

[38] " 'Employ' includes to suffer or permit to work." (29 U.S.C. § 203(g).)

[88 L.Ed. 1170, 64 S.Ct. 851]). (See *Goldberg v. Whitaker House Coop.*, *supra*, at p. 33.) We see no reason to substitute this definition of employment, which has no basis in California law, for definitions in wage orders regularly adopted by the IWC.

Furthermore, the language used by the IWC in wage orders since 1947 to define "employer"—"employs or exercises control over the wages, hours, or working conditions of any person"[39]—does not appear anywhere in the FLSA (29 U.S.C. § 201 et seq.) or its implementing regulations. One court has suggested the wage orders' definition of "employer" is "almost identical" to the federal definition (*Bureerong v. Uvawas* (C.D.Cal. 1996) 922 F.Supp. 1450, 1470), but a comparison of the different state and federal definitions does not confirm the observation.[40] Instead, as noted (see, *ante*, at p. 59 et seq.), the wage orders' language mirrors the scope of the IWC's regulatory authority over wages, hours and working conditions (§ 1173) and by its terms imposes liability on multiple entities who divide among themselves control over those different aspects of the employment relationship.

The IWC has on occasion deliberately incorporated federal law into its wage orders. However, "where the IWC intended the FLSA to apply to wage orders, it has specifically so stated." (*Morillion v. Royal Packing Co., supra,* 22 Cal.4th 575, 592.) For example, IWC wage orders Nos. 1-2001 through 13-2001, 15-2001 and 16-2001 all expressly incorporate specific federal regulations issued under the FLSA to define exempt executive, administrative and/or professional employees.[41] In contrast, the wage order applicable to this case (Wage Order No. 14) and one other (IWC wage order No. 17-2001) do not. The only reference to federal law in Wage Order No. 14 appears in a provision exempting individuals participating in national service programs.[42] All wage orders contain a similar provision. No wage order, however, incorporates federal law in defining the terms "employ" or "employer."

---

[39] IWC former wage order No. 1R, section 2(f); see, e.g., Wage Order No. 14 (Cal. Code Regs., tit. 8, § 11140, subd. 2(F)).

[40] Under the FLSA, " '[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency, but does not include any labor organization (other than when acting as an employer) or anyone acting in the capacity of officer or agent of such labor organization." (29 U.S.C. § 203(d).)

[41] For example: "The activities constituting exempt work and non-exempt work [for executive employees] shall be construed in the same manner as such items are construed in the following regulations under the Fair Labor Standards Act effective as of the date of this order: 29 C.F.R. Sections 541.102, 541.104–111, and 541.115–116." (IWC wage order No. 1-2001, Cal. Code Regs., tit. 8, § 11010, subd. 1(A)(1)(e) [manufacturing industry].)

[42] "The provisions of this order shall not apply to any individual participating in a national service program, such as AmeriCorps, carried out using assistance provided under Section 12571 of Title 42 of the United States Code. (See Stats. 2000, ch. 365, amending Labor Code Section 1171.)" (Wage Order No. 14, Cal. Code Regs., tit. 8, § 11140, subd. 1(E).)

■ We have previously cautioned against "confounding federal and state labor law" (*Ramirez v. Yosemite Water Co., supra,* 20 Cal.4th 785, 798) and explained "that where the language or intent of state and federal labor laws substantially differ, reliance on federal regulations ˙or interpretations to construe state regulations is misplaced" (*ibid.*; see also *Morillion v. Royal Packing Co., supra,* 22 Cal.4th 575, 588). Courts must give the IWC's wage orders independent effect in order to protect the commission's delegated authority to enforce the state's wage laws and, as appropriate, to provide greater protection to workers than federal law affords.[43] (See *Morillion v. Royal Packing Co., supra,* 22 Cal.4th 575, 592; *Ramirez v. Yosemite Water Co., supra,* 20 Cal.4th 785, 798.) We therefore apply the applicable wage order according to its terms, having in mind its distinct language, history and function in the context of state wage law.

## H. *Summary Judgment.*

This case comes to us on review of a summary judgment. Defendants are entitled to summary judgment only if "all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To determine whether triable issues of fact do exist, we independently review the record that was before the trial court when it ruled on defendants' motion. (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64 [74 Cal.Rptr.3d 108, 179 P.3d 905]; *State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034–1035 [6 Cal.Rptr.3d 441, 79 P.3d 556].) In so doing, we view the evidence in the light most favorable to plaintiffs as the losing parties, resolving evidentiary doubts and ambiguities in their favor. (*Johnson v. American Standard, Inc., supra,* at p. 64.)

### 1. *Plaintiffs' claims under the wage laws.*

We first consider plaintiffs' claim that defendants are liable as employers for plaintiffs' unpaid minimum wages under section 1194 and Wage Order No. 14 because defendants allegedly "suffer[ed], or permit[ted plaintiffs] to work" and/or "exercise[d] control over [their] wages, hours, or working conditions . . . ." (Wage Order No. 14, Cal. Code Regs., tit. 8, § 11140, subd. 2(C), (F).)

---

[43] No party to this case argues that federal law defines the employment relationship more favorably to plaintiffs than Wage Order No. 14 defines it. Defendants, as noted, ask us to apply federal law because they believe the federal definition to be potentially less favorable to plaintiffs, and plaintiffs expressly disavow any argument that defendants were their employers under federal law.

### a. *"[S]uffer, or permit to work."*

The IWC, as we have seen, borrowed its definition of "employ"—"to engage, suffer, or permit to work"[44]—in 1916 from the language of early 20th-century statutes prohibiting child labor. (See, *ante*, at p. 57 et seq.) Statutes so phrased were generally understood to impose liability on the proprietor of a business who knew child labor was occurring in the enterprise but failed to prevent it, despite the absence of a common law employment relationship. As courts had explained, the language meant "that [the proprietor] shall not *employ* by contract, nor shall he *permit* by acquiescence, nor *suffer* by a failure to hinder." (*Curtis & Gartside Co. v. Pigg, supra,* 134 P. 1125, 1129.) The language thus "cast[] a duty upon the owner or proprietor to prevent the unlawful condition, and the liability rest[ed] upon principles wholly distinct from those relating to master and servant. *The basis of liability is the owner's failure to perform the duty of seeing to it that the prohibited condition does not exist.*" (*People v. Sheffield Farms-Slawson-Decker Co.* (N.Y.App.Div. 1917) 180 A.D. 615 [167 N.Y.S. 958, 961, 36 N.Y. Cr. 181], italics added, affd. (1918) 225 N.Y. 25 [121 N.E. 474, 477] ["the omission to discover and prevent was a sufferance of the work"].)

We see no reason to refrain from giving the IWC's definition of "employ" its historical meaning. That meaning was well established when the IWC first used the phrase "suffer, or permit" to define employment, and no reason exists to believe the IWC intended another. Furthermore, the historical meaning continues to be highly relevant today: A proprietor who knows that persons are working in his or her business without having been formally hired, or while being paid less than the minimum wage, clearly suffers or permits that work by failing to prevent it, while having the power to do so.

Plaintiffs argue defendants Apio and Combs suffered or permitted plaintiffs to work because defendants knew plaintiffs were working, and because plaintiffs' work benefited defendants. Concerning defendants' knowledge, plaintiffs note defendants were aware Munoz would need to hire labor to supply strawberries to defendants, and that defendants' field representatives had observed Munoz's employees at work. Plaintiffs also point out that Munoz subleased the Oceano and Zenon fields from Apio, which retained a right to enter the leased property.

What is in dispute is the significance, under the wage order, of the assertion that defendants benefited from plaintiffs' labor. Certainly defendants benefited in the sense that any purchaser of commodities benefits, however

---

[44] Wage Order No. 14 (Cal. Code Regs., tit. 8, § 11140, subd. 2(C)).

indirectly, from the labor of the supplier's employees. However, the concept of a benefit is neither a necessary nor a sufficient condition for liability under the "suffer or permit" standard. Instead, as we have explained, the basis of liability is the defendant's knowledge of and *failure to prevent* the work from occurring. (See, e.g., *People v. Sheffield Farms-Slawson-Decker Co.*, *supra*, 167 N.Y.S. 958, 961 ["The basis of liability is the owner's failure to perform the duty of seeing to it that the prohibited condition does not exist."], affd. (1918) 225 N.Y. 25 [121 N.E. 474, 477] ["the omission to discover and prevent was a sufferance of the work"]; *Curtis & Gartside Co. v. Pigg*, *supra*, 134 P. 1125, 1129 [the employer "shall not . . . *permit* by acquiescence, nor *suffer* by a failure to hinder"].) Here, neither Apio nor Combs suffered or permitted plaintiffs to work because neither had the power to prevent plaintiffs from working. Munoz and his foremen had the exclusive power to hire and fire his workers, to set their wages and hours, and to tell them when and where to report to work. Perhaps Apio or Combs, by ceasing to buy strawberries, might as a practical matter have forced Munoz to lay off workers or to divert their labor to other projects, such as harvesting berries for the other defendant, for Frozsun,[45] or for Ramirez Brothers. But any substantial purchaser of commodities might force similar choices on a supplier by withdrawing its business. Such a business relationship, standing alone, does not transform the purchaser into the employer of the supplier's workforce.

Plaintiffs' interpretation of the wage order is also unreasonably broad. For the same reason that defendants benefited from plaintiffs' work, so too did the grocery stores that purchased strawberries from defendants, and the consumers who in turn purchased strawberries from the grocery stores. Had the IWC intended to impose a rule capable of creating such potentially endless chains of liability, one would expect the commission to have announced it in the plainest terms after vigorous debate. Yet the concept of downstream benefit as a sufficient basis for liability appears nowhere in the wage order's definition of "employ" or in the decisions interpreting the child labor statutes from which the IWC borrowed the definition. We reject plaintiffs' broad interpretation of the IWC's definition of "employ" for this reason.

We also note that plaintiffs' broad interpretation of the IWC's definition of "employ" would be difficult to justify as an appropriate exercise of the commission's power. The IWC's power to define employment is, as we have explained, not expressly granted in the act creating the commission but merely implied, and thus extends only so far as necessary to permit the

---

[45] Munoz's contracts with Apio and Combs permitted him to sell freezer berries from the Oceano, Zenon and El Campo fields to a third party such as Frozsun. Munoz's contract with Apio expressly covered only fresh berries, and his contract with Combs was so interpreted by the parties, as plaintiffs concede.

commission effectively to exercise its expressly granted powers to regulate wages, hours and working conditions. (*Cal. Drive-in Restaurant Assn. v. Clark, supra,* 22 Cal.2d 287, 302.) "[A]n administrative agency may not, under the guise of its rule making power, abridge or enlarge its authority or exceed the powers given to it by the statute, the source of its power." (*Id.,* at pp. 302–303.) Accordingly, regulations issued by an administrative agency such as the IWC under a delegation of legislative power must be reasonably necessary to effectuate the purposes of the statute. (*Ramirez v. Yosemite Water Co., supra,* 20 Cal.4th 785, 800; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 11 [78 Cal.Rptr.2d 1, 960 P.2d 1031].) That the IWC has not, in nearly a century of administering the minimum wage, seen fit to propose plaintiffs' downstream-benefit theory of liability strongly suggests the theory is not reasonably necessary to permit the commission to discharge its statutory responsibilities. We also find significant that the single rule of California law that even approaches the breadth of plaintiffs' theory in imposing liability for wages appears not in a wage order adopted by the IWC, but in a statute enacted by the Legislature. (§ 2673.1, subd. (a).)[46] These considerations suggest that rules of liability as broad as those plaintiffs advocate are appropriately left to the Legislature.

 b. *"[E]xercises control over . . . wages, hours, or working conditions . . . ."*

 i. *Defendant Apio.*

Plaintiffs next argue that defendant Apio, through its contractual relationship with Munoz, dominated his business financially and thus exercised indirect control over his employees' wages and hours.[47] In making this argument, plaintiffs seek to portray Munoz as a straw man, engaged by Apio to shield itself from agricultural workers' wage claims. Certainly Wage Order No. 14's definition of "employer," which encompasses "any person . . . *who directly or indirectly, or through an agent or any other person,* employs or exercises control over the wages, hours, or working conditions of any person,"[48] is broad enough to reach through straw men and other sham arrangements to impose liability for wages on the actual employer. The undisputed facts, however, show that Munoz alone controlled plaintiffs' wages, hours and working conditions.

---

[46] "To ensure that employees are paid for all hours worked, a person engaged in garment manufacturing, as defined in Section 2671, who contracts with another person for the performance of garment manufacturing operations shall guarantee payment of the applicable minimum wage and overtime compensation, as required by law, that are due from that other person to its employees that perform those operations." (§ 2673.1, subd. (a).)

[47] Plaintiffs do not make the same argument against Combs, whose relationship with Munoz was very similar to Apio's.

[48] Wage Order No. 14 (Cal. Code Regs., tit. 8, § 11140, subd. 2(F), italics added).

Plaintiffs contend Apio indirectly controlled Munoz's ability to pay his employees because Apio unilaterally decided the amount of estimated net proceeds to advance to Munoz as Pick-Pack payments, and because Apio demanded that Munoz continue to harvest produce that would not produce a net return. Apio's right to set off its expenses, however, was simply an aspect of its contractual relationship with Munoz. Munoz had made a profit from the same relationship in prior years. Plaintiffs note that Apio reduced its Pick-Pack payments below the $2 level initially set by contract as the end of the season neared and the market deteriorated, but the contract unequivocally permitted Apio to set off its expenses before remitting net proceeds. Moreover, nothing in the record shows that Apio ever compelled Munoz to harvest on any occasion. Although Munoz had strong incentives to harvest fresh market berries for Apio in order to repay Apio's preseason advance and also to make a profit for himself, he testified without contradiction that he, alone, decided which fields to harvest on any given day and whether to harvest strawberries for fresh market sale or for the freezer. So far as the record discloses, negotiations between Apio and Munoz over the amount of fresh market berries to be delivered took place in the field, after Munoz had already informed Apio that he planned to harvest fresh market berries from the Oceano or Zenon field on a given day. While Munoz stated on May 27, 2000, during the work stoppage in El Campo, that he could not pay his workers because Apio was withholding payment, the undisputed facts show that Apio had paid Munoz ahead of schedule and more than it was eventually determined to owe him.

More importantly, plaintiffs' factual assertions do not establish that Apio's business relationship with Munoz allowed the company to exercise control over Munoz's employees' wages and hours. In making the argument, plaintiffs ignore the following undisputed facts: First, Munoz operated a single, integrated business operation, growing and harvesting strawberries for several unrelated merchants and combining revenue from all sources with a personal investment, in the hope of earning a profit at the end of the season. Munoz paid his employees out of those combined revenues and assets. Second, Munoz had losses unrelated to his business with Apio from his unsuccessful business with Ramirez Brothers, who paid Munoz nothing during the 2000 season. Third, Munoz had substantial revenue from other sources on May 27, 2000. On that same day, Frozsun paid Munoz $149,340, bringing to $181,003 the amount it had paid him since April 29. This source of revenue continued until August 12, by which date Frozsun had paid Munoz a total of $476,955. Finally, Munoz alone, with the assistance of his foremen, hired and fired plaintiffs, trained and supervised them, determined their rate and manner of pay (hourly or piece rate), and set their hours, telling them when and where to report to work and when to take breaks. Plaintiffs' claim that Apio dominated Munoz's financial affairs cannot be reconciled with these facts.

Taking a different approach not based on the applicable wage order, plaintiffs attempt to compare this case with *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 [256 Cal.Rptr. 543, 769 P.2d 399] (*S.G. Borello*), in which we held that workers hired by a large agricultural landowner under "sharefarmer" agreements were employees rather than independent contractors for purposes of the workers' compensation law. (§ 3200 et seq.) The sharefarmers, we found, "exhibit no characteristics which might place them outside the Act's intended coverage of employees. They engage in no distinct trade or calling. They do not hold themselves out in business. They perform typical farm labor for hire wherever jobs are available. They invest nothing but personal service and hand tools. They incur no opportunity for 'profit' or 'loss'; like employees hired on a piecework basis, they are simply paid by the size and grade of cucumbers they pick. They rely solely on work in the fields for their subsistence and livelihood." (48 Cal.3d at pp. 357–358, fns. omitted.) Applying the common law test of employment in light of the remedial purposes of the workers compensation law, we reasonably concluded the sharefarmers were, "[w]ithout doubt, . . . a class of workers to whom the protection of the [workers' compensation law] is intended to extend." (*Id.*, at p. 358, fn. omitted.)

Assuming the decision in *S.G. Borello*, *supra*, 48 Cal.3d 341, has any relevance to wage claims, a point we do not decide, the case does not advance plaintiffs' argument. Plaintiffs are correct in that, if Munoz had been Apio's employee rather than an independent contractor, Munoz's employees arguably would also have been Apio's employees; the determination that a purported independent contractor is in fact an employee raises the strong possibility, generally speaking, that the contractor and its employer jointly employ the contractor's employees. (*Rinaldi v. Workers' Comp. Appeals Bd.* (1991) 227 Cal.App.3d 756, 759 [278 Cal.Rptr. 105], and cases cited.) But Munoz was not Apio's employee. In contrast to the sharefarmer-employees in *S.G. Borello*, Munoz held himself out in business, invested substantial capital and equipment, employed over 180 workers, sold produce through four unrelated merchants, enjoyed an opportunity for profit or loss dependent on his business acumen and market conditions, and had indeed made a profit in prior years operating in the same manner.

Next, plaintiffs argue Apio controlled their wages on June 8 or 9, 2000, when Apio's vice-president Tim Murphy cooperated with the DLSE and Munoz to ensure that Munoz used Apio's final advance of net proceeds to pay his workers. (See, *ante*, at p. 47.) The argument fails. At that time, as noted, Murphy gave Munoz a check for $77,662, Munoz endorsed the check to the bank, and the bank immediately issued cashier's checks payable to 71 employees whose names Munoz had provided. In so doing, Apio participated

with the government in what amounts to a garnishment of money owed to Munoz for the benefit of his employees. To hold on this basis that Apio controlled plaintiffs' wages would punish Apio for cooperating with the DLSE's attempt to enforce the wage laws and likely deter future cooperation by others.

Viewing the undisputed evidence in the light most favorable to plaintiffs, we find no basis for concluding Apio exercised control over plaintiffs' wages and hours.

### ii. *Defendant Combs.*

Plaintiffs contend defendant Combs exercised control over their wages and hours based on the events of May 27, 2000, at the El Campo field. On that date, as noted (see, *ante*, at p. 46 et seq.), plaintiffs had been picking freezer berries and stopped work to talk with Jose Serrano about unpaid wages. Juan Ruiz, Combs's agent, convinced some of Munoz's employees to return to work. According to plaintiff Asuncion Cruz, "Juan [Ruiz] . . . told us to keep working and help Munoz. Juan told us not to worry and said he guaranteed we would be paid as his boss had checks he was delivering to Isidro Munoz." Cruz "heard workers tell Juan they were concerned that the amount of the check he brought with him would not be enough to pay everyone. Juan told us not to worry as he would deliver even larger amounts of money from his boss to Isidro Munoz the following week, and even more money the week after that, which would be enough to pay us all." Cruz's declaration is consistent with those of others who heard Ruiz speak; the record contains no statements by Ruiz about what he said.

Based on this evidence, plaintiffs contend that "Combs offered [plaintiffs] employment through its agent Ruiz." Assuming for the sake of argument Ruiz was acting as Combs's agent in making the alleged statements,[49] the evidence in our view does not fairly support the inference that Ruiz offered plaintiffs employment. Certainly a promise to pay a person for work would be an offer of employment, as well as an exercise of control over wages and hours sufficient to bring the promisor within the wage order's definition of "employer." (Wage Order No. 14, Cal. Code Regs., tit. 8, § 11140, subd. 2(F).) But Ruiz did not offer plaintiffs employment with Combs. Instead, he asked

---

[49] The question of agency is disputed. Combs's principals declare that Ruiz was not hired by the company as an employee until June 1, 2000, and that they have never authorized Ruiz to make promises to growers' employees on Combs's behalf. Several witnesses, however, including Munoz, his foreman Leon, and some of his employees, state that Ruiz frequently visited the El Campo field on Combs's behalf during the fresh berry harvest, which reached its peak in April and May and ended before June, to check the quality of strawberries and explain how they should be packed.

plaintiffs to continue working to "help Munoz" and pointed out that Munoz was not yet utterly without funds to pay them, as he was still receiving payments from Combs. Plaintiffs' declarations show they understood the distinction, as they questioned Ruiz not about the terms of any hypothetical work for Combs but about whether "the amount of the check [Ruiz had] brought with him would . . . be enough to pay everyone." That plaintiffs were not working for Combs on May 27 was also reasonably apparent in that they were harvesting freezer berries in bulk rather than picking and packing fresh berries for market sale. Again, plaintiffs understood the distinction and recognized Ruiz as " 'Juan,' the person [they had seen] checking the strawberries . . . for the company to whom Munoz delivered the *market* strawberries we picked for sale." (Italics added.)

For these reasons, we find plaintiffs' argument lacks merit.

### iii. *Defendant Ruiz.*

Relying on the same evidence, plaintiffs also contend that Ruiz personally exercised control over their wages and hours and is thus personally liable as an "employer" under section 1194 and Wage Order No. 14. The claim fails under our holding in *Reynolds, supra,* 36 Cal.4th 1075, that the IWC's definition of "employer" does not impose liability on individual corporate agents acting within the scope of their agency. (*Reynolds,* at p. 1086.) Plaintiffs specifically allege in the operative complaint that Ruiz, in making the alleged statements on May 27, 2000, was "acting in his capacity as agent for [Combs] . . . ."

### iv. *Defendants Apio and Combs.*

Plaintiffs contend that defendants Apio and Combs, through their field representatives' activities in the areas of quality control and contract compliance, became joint employers of Munoz's workers by "exercis[ing] control over [their] . . . working conditions" within the meaning of Wage Order No. 14. (Cal. Code Regs., tit. 8, § 11140, subd. 2(F).) Plaintiffs devote little attention to the argument, but it deserves discussion.

As we have noted, picking and packing strawberries for fresh market sale necessitated close communication during the harvest between defendants and Munoz's personnel. This is because market berries are packed in the field, as they are picked, into the containers in which they will be sold to consumers, often that same day or the next. The contract between Apio and Munoz expressly provided for such activities, and Munoz operated in the same manner with Combs, apparently as a matter of standard practice. (See, *ante,* at p. 45.) Viewing the facts most favorably to plaintiffs, Apio sent its

representatives Juan Toche and Manuel Cardenas to the field on days when Munoz harvested fresh berries from the Oceano and Zenon fields, and Combs sent defendant Juan Ruiz when Munoz harvested berries from El Campo. Apio's and Combs's representatives followed the same procedure: In the morning, the representatives would explain to Munoz and his foremen how the merchant wanted strawberries packed, and Munoz and his foremen would demonstrate the packing style to the workers. For about an hour, the representatives, together with Munoz and his foremen, would check the packed containers as workers brought them from the field to the truck where they would be loaded for shipping. While the representatives would generally bring problems to the attention of Munoz and his foremen, they would also sometimes speak directly to the workers, pointing out mistakes in packing such as green or rotten berries. In the afternoon, the representatives would return briefly to check the quality and quantity of berries in the loaded truck.

The question is whether this evidence raises a triable issue of fact as to whether Apio and Combs exercised control over the working conditions of Munoz's employees. As we have explained, one of the reasons the IWC defined "employer" in terms of exercising control was to reach situations in which multiple entities control different aspects of the employment relationship. This occurs, for example, when one entity (such as a temporary employment agency) hires and pays a worker, and another entity supervises the work. (See, *ante*, at pp. 59–60.) Supervision of the work, in the specific sense of exercising control over how services are performed, is properly viewed as one of the "working conditions" mentioned in the wage order. To read the wage order in this way makes it consistent with other areas of the law, in which control over how services are performed is an important, perhaps even the principal, test for the existence of an employment relationship. (See, e.g., *Metropolitan Water Dist. v. Superior Court, supra*, 32 Cal.4th 491, 512 [common law]; *Tieberg v. Unemployment Ins. App. Bd.* (1970) 2 Cal.3d 943, 946 [88 Cal.Rptr. 175, 471 P.2d 975] [unemployment insurance]; *McFarland v. Voorheis-Trindle Co.* (1959) 52 Cal.2d 698, 704 [343 P.2d 923] [workers' compensation].)

While the evidence indicates that Apio's and Combs's field representatives spoke with Munoz's employees about the manner in which strawberries were to be packed, it does not indicate the field representatives ever supervised or exercised control over his employees. No evidence suggests Munoz's employees viewed the field representatives as their supervisors or believed they owed their obedience to anyone but Munoz and his foremen. Plaintiffs, relying on cases interpreting other bodies of law, argue the *right* to exercise control over the manner in which work is performed is sufficient to prove the existence of an employment relationship, whether or not the right is exercised. (E.g., *S.G. Borello, supra*, 48 Cal.3d 341, 350; *Tieberg v. Unemployment*

*Ins. App. Bd., supra,* 2 Cal.3d 943, 946.) But even assuming the same rule applies here, Munoz's contracts with Apio and Combs gave the merchants no right to direct his employees' work. Neither does any evidence in the record suggest that *anyone*—Munoz, Apio, Combs, the merchants' field representatives, or plaintiffs—believed the merchants or their representatives had such a right. Confusion on this point was not likely to arise, since Munoz and his foremen were present when the field representatives interacted with Munoz's employees. For all of these reasons, we conclude the claim lacks merit.

### 2. *Plaintiffs' claims as purported third party beneficiaries.*

Lastly, plaintiffs contend they are entitled to recover unpaid wages as third party beneficiaries of the contract between Munoz and Apio. The claim has no factual basis. Nowhere in its contract with Munoz did Apio undertake to pay his employees under any set of conditions. There simply is no relevant obligation to enforce.

In their contract, Apio and Munoz agreed that Munoz would be "solely responsible for the selection, hiring, firing, supervision, assignment, direction, setting of wages, hours, and working conditions" of his employees, among other things. In addition, Munoz warranted that he would "comply with all provisions of federal, state and local laws applicable to [his] farming operations, including, without limitation, *labor* . . . ." (Italics added.) Finally, Munoz and Apio each agreed to indemnify the other from claims "concerning . . . the employment of individuals . . . to perform such party's functions under this Agreement, including . . . matters pertaining to . . . *wages* . . . ." (Italics added.) The plain import of these contractual provisions is that Munoz agreed to pay his employees the wages required by law, assuming sole responsibility in the matter, and to indemnify Apio if his employees sued Apio for unpaid wages.

Apio contends plaintiffs cannot establish standing to enforce the contract because no evidence shows the parties to the contract, Apio and Munoz, intended to benefit plaintiffs. (See *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524 [117 Cal.Rptr.2d 220, 41 P.3d 46]; Civ. Code, § 1559.) We need not decide the point. Even if plaintiffs could establish standing, they would gain thereby only the right to stand in Apio's shoes and enforce the contract's terms by suing Munoz to compel him to pay their wages. This, Munoz's bankruptcy precludes. Nothing in the rules of law concerning third party beneficiaries permits us to rewrite the contract to impose on Apio an obligation to pay wages that it never undertook.

## III. Disposition

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Baxter, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellants' petition for a rehearing was denied June 30, 2010, and on June 9, 2010, the opinion was modified to read as printed above.