Filed 7/2/21  Catalan v. Arakelian Enterprises CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| FERNANDO O. CATALAN, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> ARAKELIAN ENTERPRISES, INC., <br><br> Defendant and Respondent. | B297858, B302331 <br><br> (Los Angeles County Super. Ct. No. BC562181) |

APPEALS from a judgment and an order of the Superior Court of Los Angeles County.  David S. Cunningham III, Judge. Judgment (B297858) and postjudgment order (B302331) affirmed.

Mostafavi Law Group, Amir Mostafavi; Lichten & Liss-Riordan and Shannon Liss-Riordan for Plaintiff and Appellant.

Epstein Becker & Green, Adam C. Abrahms, Susan Graham and Story E. Cunningham for Defendant and Respondent.

————————————————

# SUMMARY

Plaintiff Fernando Catalan sued All Service Disposal, Inc. (All Service) and Arakelian Enterprises, Inc., doing business as Athens Services (Athens), alleging wage and hour violations as well as other causes of action in connection with his employment as a truck driver. He contended the two companies were his joint employers, and both were liable for failure to pay overtime, willful failure to pay wages to an employee who is discharged, knowing and intentional failure to furnish itemized wage statements, failure to provide meal breaks, and civil penalties under the Private Attorneys General Act (PAGA, Lab. Code, § 2698 et seq.), among other claims. Further statutory references are to the Labor Code unless otherwise specified.

His claims were tried to the court. The trial court found the two defendants were joint employers, and that ruling is not challenged on appeal.

The court then found plaintiff failed to prove his overtime and meal break claims. The court found All Service, which directly employed plaintiff and paid his wages, stopped providing itemized wage statements in 2014, and was liable to plaintiff for penalties for failure to provide 40 wage statements. All Service also failed to timely pay the wages due on plaintiff's termination, and was liable for 18 days of waiting time penalties.

However, the court found Athens had no knowledge of or control over how All Service handled its paychecks to plaintiff, or when All Service paid plaintiff, and did not know when All Service terminated plaintiff's employment, and so was not liable for the wage statement violations or for the waiting time penalties. The court declined to award penalties for the Labor

2

Code violations under PAGA, and later awarded Athens its costs as the prevailing party.

Plaintiff challenges the trial court's rulings on his overtime and meal break claims. He also contends Athens is necessarily liable, by virtue of its status as his joint employer, for the wage statement violations and waiting time penalties. Plaintiff also contends the court erred in declining to award civil penalties under PAGA and erred in awarding Athens its costs as the prevailing party.

This is an unusual wage and hour case because the trial court found plaintiff's testimony lacked credibility and he brought his overtime claim in bad faith. We are in no position to second-guess the trial court's credibility calls and, in any event, we agree with the trial court. We find substantial evidence supports the trial court's judgment that plaintiff's testimony should be disregarded and affirm the judgment and the award of costs.

**FACTS**

## 1.    Background

Defendant Athens is a waste collection and recycling company. Among other things, it operates a materials recovery facility in City of Industry. A part of Athens's business involved hauling trash from its facility to various landfills. Athens employed its own truck drivers (called "transfer drivers") to do that work, but also contracted with several outside contractors whose drivers performed the same work.

One of these outside contractors was defendant All Service, a company owned by Robert Sarkissian. Athens entered into an "independent sub-hauler agreement" with All Service on November 1, 2010. All Service employed plaintiff as a truck driver hauling for Athens until his discharge in August 2014. All

3

Service provided the trailer trucks that plaintiff drove to transport waste materials from Athens's facility to landfills Athens designated.

All Service paid plaintiff's wages, including overtime, based on daily log sheets plaintiff filled out and turned in to All Service. Athens was involved in plaintiff's interview process when he was hired, All Service consulted Athens to determine plaintiff's hourly wage, and Athens determined the landfills to which he was assigned. The trial court concluded from these and other facts that Athens "exercised control over Plaintiff's wages, hours, and working conditions."

All Service terminated plaintiff's employment in August 2014, after he did not show up for work and Mr. Sarkissian could not get in touch with him.

## 2. Procedures and Responsibilities

During his employment, plaintiff usually hauled three loads of trash each day from the Athens facility to landfill sites. Plaintiff usually worked six days a week. His workday began and ended at the All Service lot, where his truck was parked.

Plaintiff was responsible for recording his time on daily log sheets provided by Athens. At the top, these log sheets had spaces to fill in the date, truck and trailer numbers, a "time clock" ("in" and "out"), and lunch and break times.

In addition, plaintiff was required to record information on the log sheet about each of his trips to the landfill. This included the landfill ticket number, the material and weight hauled, and six time entries: the time he started and finished loading the truck at the Athens facility; the time he started and finished unloading at the landfill; and the time he departed the landfill and arrived back at the Athens facility. Athens used this

4

information internally for costing purposes, to verify landfill billing, and to compare the efficiency of its own transfer drivers with that of the outside contractors' drivers.

The log sheet form was in triplicate for outside contractor drivers (but not for Athens's own transfer drivers), because the contractors' drivers wanted copies. Plaintiff (and other outside contractors' drivers) would put one copy of the form in a mailbox at the Athens facility, and plaintiff would give the other two to All Service. All Service used these copies as time sheets for its drivers. (The parties variously refer to them as log sheets and time sheets.)

Athens did not report the log sheet information to anyone or otherwise use it to calculate compensation for plaintiff; it was "strictly for costing what our bills were from landfills and what it cost us and how long it took us." Athens did not keep track of plaintiff's time for payroll in any way. Athens used an electronic timekeeping system for its own employees, who had to clock in and out at the facility on that electronic system.

As already mentioned, All Service paid plaintiff's wages, based on the time he recorded "in" and "out" in the time clock space at the top of his daily log sheets. Plaintiff also wrote the total number of hours he worked on the back of the log sheets. It was undisputed that All Service paid plaintiff on the honor system, and All Service did not question the accuracy of plaintiff's daily log sheets. Plaintiff testified it was "all about [his] voluntarily reporting [his] own time." Plaintiff (and All Service's other drivers) would turn in their log sheets to Mr. Sarkissian, or leave them on his car windshield if he was not at the All Service lot. Mr. Sarkissian "took [plaintiff's] word for" the total hours plaintiff reported on the log sheets. On a weekly basis,

5

Mr. Sarkissian sent emails to an accounting firm, the DuBois firm, that provided payroll tax services for All Service, noting the number of hours plaintiff reported that he worked on each day of that week.

The DuBois firm then calculated the net amount of wages due, prepared an itemized wage statement showing regular and overtime hours and withholding deductions, and sent the wage statement to Mr. Sarkissian, who then wrote a check to plaintiff for the amount due. Mr. Sarkissian only "[o]ccasionally" gave the wage statements to plaintiff with his check, "[w]hen he requested them." The DuBois firm also prepared plaintiff's W-2 tax forms for All Service. All Service paid plaintiff for all the time he reported, including substantial amounts of overtime.

At the beginning of 2014, All Service stopped the payroll tax services provided by the DuBois firm, and stopped providing wage statements to plaintiff. Mr. Sarkissian calculated plaintiff's wages himself, in the same manner as before, using the hours plaintiff noted on the log sheets. He withheld federal taxes "by going off previous [wage] statements."

Mr. Sarkissian terminated plaintiff's employment on August 26, 2014. He did not consult anyone from Athens when he decided to terminate plaintiff. Plaintiff received his final paycheck on September 20, 2014.

3. **The Lawsuit and Bench Trial**

Plaintiff filed this lawsuit in October 2014, alleging 17 causes of action against All Service and Athens. Athens obtained summary adjudication of 10 of the claims. In April and May 2018, a bench trial was held on the claims that remained against both parties. This was to be followed by a jury trial

6

against All Service on discrimination, wrongful termination and related claims, but All Service defaulted.

At the bench trial, plaintiff sought to establish claims for failure to pay overtime (§§ 510 & 1194); failure to provide accurate wage statements (§ 226); failure to pay wages timely upon termination (§ 203); conversion; unfair business practices (Bus. & Prof. Code, § 17200 et seq.), including failure to provide meal breaks; and violations of other Labor Code sections and regulations that are not at issue on appeal.

Plaintiff's principal claim was that for the four years of his employment, defendants failed to pay him for one and a half to two hours he worked each day, time that he *did not record* on his log sheets.

Plaintiff testified that, after he dumped his last load of the day at the landfill, he was required to, and did, drive back to the Athens facility to drop off his log sheet. He recorded his time "out" as the time he arrived at the Athens facility, and he did not record the ensuing time he spent driving back to the All Service lot to park and inspect his vehicle, which took him one and a half to two hours each day. Plaintiff testified he was told his daily log sheet "has to be in the box at the end of the day," thus requiring him to drive to the Athens facility before returning to the All Service lot.

This testimony was inconsistent with plaintiff's deposition testimony. At his deposition, plaintiff testified that after his last load, he would drive directly to the All Service lot, and that he would turn in his log sheets the following day.

This testimony was also contradicted by the testimony of other witnesses. Diane Olin, who had been the office manager of the Athens facility at the relevant time, testified that Athens

7

never required any contractor driver to submit the log sheet "on the same day after they were done with their last load." Mr. Sarkissian testified he never instructed plaintiff that he had to turn in his log sheet to Athens at the end of the day, and that plaintiff typically turned it in "the first trip of the next day."

Mr. Sarkissian also testified that plaintiff was instructed that the in-and-out times in the time clock square were the time he arrived for work at the All Service lot, and the time he was done working and left the All Service lot after dropping off his truck.

There was further evidence in the form of an email from Ms. Olin to All Service, reporting that All Service drivers were "not always turning in their paperwork on time"; the email (on Wednesday, February 20, 2013) stated that on "Monday I received a log sheet from [plaintiff] for Feb 9."

At his deposition, plaintiff also testified "I don't know" and "I don't recall" when asked if he "ever complain[ed] to Mr. Sarkissian about not being paid the wages you were owed." He admitted at trial that "nothing prohibited [him] from writing a different time [than the time he claimed he got back to the Athens facility] in the ultimate 'out' column." He acknowledged that he was paid for the overtime hours he reported.

Plaintiff also sought to prove that, every day of his four-year employment, defendants failed to provide him with a 30-minute meal period. Plaintiff testified that he never took a meal break during the four years of his employment, and that he would bring lunch and eat in the truck as he was driving. He also testified there was no time to take rest breaks "because if I did, I would miss the last dump."

8

Mr. Sarkissian testified that he told plaintiff at the beginning of his employment he was free to take a lunch break "whenever he chose to," and Mr. Sarkissian's understanding was that plaintiff did so every day. "When he felt fit to take a break or to take lunch, it was his choice." Plaintiff never told Mr. Sarkissian that he did not take a lunch break. Mr. Sarkissian paid plaintiff based on the log sheets he submitted "regardless of whether he took a half hour out of his day to take a lunch break."

Andy Lucero was a supervisor at the Athens facility who was responsible for safety and productivity, and who supervised the transfer drivers employed by Athens. He testified the Athens drivers were expected to take a 30-minute lunch break, and that there were lunch trucks at the landfills and at the Athens facility, as well as fast food restaurants along the route. Mr. Lucero said the Athens drivers were required to take their meal periods and encouraged to take rest breaks. He directed Athens drivers to record their meal periods on their daily log sheets, and reviewed the log sheets to determine if they did so. He testified the typical Athens driver would deliver an average of three loads a day, and most Athens drivers have the opportunity to take their meal periods.

Mr. Lucero never looked at plaintiff's daily log sheets, which were never delivered to him, and plaintiff never told Mr. Lucero that he was not getting meal periods.

Mr. Lucero testified the Athens facility loaded transfer drivers beginning at "5:30 a.m. and the latest would have been 7:00 p.m.," and plaintiff could pick up loads at any time between those hours. Mr. Lucero did not care when plaintiff started work. Mr. Lucero was not familiar with plaintiff's work schedule for All

9

Service, and did not keep track of his arrival time. He had no review authority over plaintiff's daily log sheets.

## 4.     The Trial Court's Decision

The court received briefing after the trial ended in May 2018 and heard closing arguments in July 2018. The court issued a minute order summarizing its oral tentative statement of decision. After observing that the entire basis for plaintiff's overtime claim was his own testimony that he was not paid for the time spent driving back to the All Service lot from the Athens facility at the end of the day, the court stated that "plaintiff's claims lack credibility." The court further stated that "[p]laintiff lacks credibility as a trial witness and his testimony was impeached ma[n]y times during the trial."

At the hearing, after noting Ms. Olin's testimony and plaintiff's own contradictory testimony, the court stated that "when I look further at the fact that indeed All Service[] paid [plaintiff] for overtime that he claimed, for him to now say, yeah, but you didn't pay me enough, and he never claimed it I think is just bad faith. That's where the court is."

In February 2019, the court issued its amended final statement of decision. In rejecting plaintiff's overtime claim, the court stated that "[n]o evidence was submitted to establish that either All Service or Athens knew or should have known that Plaintiff was incurring additional time at the end of his day, as he claims . . . . [W]hile Plaintiff argued that he was required to return to Athens' facility to submit his time sheets every day, Plaintiff's trial testimony was impeached and contradicted by his own testimony and by testimony from Defendants' former employee Diane Olin that he would turn his sheets in on the next day or irregularly."

10

Plaintiff's conversion claim was premised on his claim for unpaid overtime and failed along with it. The court also ruled against plaintiff on his claim that he was not paid on regularly established paydays (§§ 204, 210), finding plaintiff's testimony regarding late wages was not credible. This ruling is not challenged on appeal.

The court also rejected as not credible plaintiff's testimony that he was denied meal and rest breaks. The court found plaintiff's testimony concerning meal periods was contradicted by evidence showing he was informed of his right to take meal periods and his log sheets included an entry space for reporting meal periods. "Plaintiff did not testify or present any evidence that he informed Sarkissian or any individual that he did not have time to take meal or rest breaks or that he was ever discouraged from taking meal or rest breaks."

The court found plaintiff was entitled to penalties for All Service's failure to provide wage statements from the beginning of 2014 (40 wage statements for total penalties of $4,000). Likewise, the evidence showed All Service failed to pay plaintiff the wages that were due on termination. Plaintiff was thus entitled to statutory waiting time penalties, "calculated at $187.00 per day for the eighteen work days between Plaintiff's termination on August 26, 2014 and September 20, 2014," when he received his final paycheck, for a total of $3,366.

The court found Athens was not liable for the wage statement and waiting time penalties. The court found Athens had no knowledge or control over when All Service paid plaintiff, and so did not willfully fail to timely pay plaintiff. The court found the wage statement violations and the failure to pay plaintiff immediately on discharge "were not willful, and the

11

Court exercises its discretion not to award additional penalties under the PAGA."

In March 2019, Athens filed a motion seeking entry of a final judgment in its favor, since Athens prevailed on all claims plaintiff alleged against it. The court granted the motion and entered judgment for Athens on May 9, 2019. According to the parties, in December 2019, All Service failed to appear for trial on the remaining claims plaintiff had asserted against it, and plaintiff obtained a default judgment against All Service.

Plaintiff filed a timely notice of appeal from the judgment for Athens. Athens filed a memorandum of costs, and the trial court awarded Athens costs of $24,149.23. Plaintiff filed a timely appeal from that order as well.

We ordered the appeals consolidated for purposes of oral argument and decision.

## DISCUSSION

### 1.    The Overtime Claim

Plaintiff contends the trial court erred in finding he failed to prove his overtime claim. He says the court improperly shifted the burden of proof to him "to keep accurate records when that is defendants' statutory duty." Plaintiff's analysis is mistaken. The court did not require plaintiff to keep accurate records. The court simply found plaintiff did not prove he performed any work for which he was not compensated.

"[T]he employee has the burden of proving that he performed work for which he was not compensated." (*Hernandez v. Mendoza* (1988) 199 Cal.App.3d 721, 727 (*Hernandez*).) *Hernandez* explains: " '[A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to

12

show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.' " (*Ibid.*, quoting *Anderson v. Mt. Clemens Pottery Co.* (1946) 328 U.S. 680, 687–688.)

Certainly, the employer has a regulatory duty to keep accurate time records, and if an employee proves he was not compensated for work performed, the consequences of the employer having no records to dispute the employee's claim fall on the employer, not the employee. But that is not what happened here. The evidence showed plaintiff was paid for all the time he reported, including substantial amounts of overtime. Wage statements from 2010 through 2013 show this. Here, plaintiff did not prove he performed overtime work for which he was not compensated. Indeed, at his deposition he testified "that [he] didn't have any reason to believe or dispute that [he was] not paid overtime correctly."

We have described the state of the evidence in the fact section, *ante,* and need not repeat it all here. Plaintiff reported his work hours, time in and time out. He was paid for the overtime hours he reported. He was unable to say when he discovered he was not being paid for all the time he worked. He contended he drove back to the Athens facility to turn in his log sheet, but the trial court believed the evidence showing he did not turn in his log sheets until the following day.

13

Plaintiff testified at trial that he talked to Mr. Sarkissian about payment for his "commuting period back to [the All Service lot]," and did so "probably in the whole time I worked for him, once or twice," and "never got an answer from it, so I just accepted it." But at his deposition, he testified he did not recall ever complaining to Mr. Sarkissian about not being paid the wages he was owed. (Mr. Sarkissian also testified plaintiff was instructed that the in-and-out times were when he arrived at and when he left the All Service lot.) Plaintiff told no one else he was working overtime that he did not report and for which he was not paid. (Cf. *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1051 (*Brinker*) ["[T]hat employees are clocked out creates a presumption they are doing no work, a presumption [the plaintiff] and the putative class members have the burden to rebut. As all parties agree, liability is contingent on proof [the employer] knew or should have known off-the-clock work was occurring"].)

Plaintiff's opening brief on appeal is as unreliable as his trial testimony. In his brief, plaintiff recites facts he describes as "uncontroverted" with record citations that do not support them. He does not describe the evidence in support of the trial court judgment. He refers to the court's adverse credibility finding— only concerning his testimony that he dropped off his daily log sheet at Athens every day—in a footnote. And then he says it does not matter when he dropped off his daily log sheet, because "Athens directed Plaintiff to list the time that he dropped off his last load as the time that his work ended." His citations to the record do not support that proposition either. The only testimony that does support it was his own ("I was told to put my exit time

when I was at Athens"), and the trial court did not believe that, for very good reasons.

Plaintiff insists that "Athens and All Service were necessarily aware that Plaintiff's log sheets did not reflect his drive back to All Service, because the end of work time that Plaintiff listed in his daily log typically corresponded with the time that *Athens' employees* authorized Plaintiff's entry into the Athens' facility upon completing his last load, to drop off his time log and landfill ticket, not when he left the All Service parking lot after inspection and parking." (Plaintiff's italics.) Again, plaintiff cites to evidence that has nothing to do with this assertion, and we can find no support for it in the record.[1]

In short, plaintiff did not prove that he drove back to the Athens facility to turn in his log sheet after he dumped his last load at the landfill. Instead, the evidence supported a contrary inference—that, as he testified at his deposition, he drove from the landfill to All Service for parking and inspection, after which he clocked out.

Plaintiff asserts the trial court held his overtime claim was defeated because of his "inability to establish a precise number of overtime hours he worked." As we have seen, that is not what the trial court did. "To prove the *amount* of hours of uncompensated work, *Mt. Clemens Pottery* and *Hernandez* permit imprecise evidence by the employee." (*Furry v. East Bay*

---

[1] Plaintiff cites one page of transcript, with plaintiff testifying about a spider bite, and a trial exhibit of emails from Diane Olin to All Service, most of them to the effect that plaintiff was not turning in his log sheets on time or otherwise not complying with Athens's regulations.

15

*Publishing, LLC* (2018) 30 Cal.App.5th 1072, 1080 (*Furry*); *ibid.* ["the underlying violation (and hence, the fact of damage) was not in dispute"].) This is not such a case.

In sum, there is no merit to the claim the trial court improperly applied the burden of proof or otherwise erred in rejecting plaintiff's overtime claim.

## 2. The Meal Period Claim

As mentioned earlier, the court concluded, "[b]ased on the evidence in the record," that plaintiff failed to prove he was denied meal and rest breaks. Plaintiff challenges the trial court's conclusion with two arguments. Plaintiff's principal argument is that the evidence showed he "had no choice but to eat his lunch in his truck while he drove," because otherwise he would have missed the third load of the day, leading to a loss of pay. He claims his testimony on the point is uncontradicted. That is plainly not correct.

We have described the evidence in the fact section, *ante* at pages 8 through 10. In brief, the drivers directly employed by Athens and supervised by Mr. Lucero were required to take their meal periods; the typical Athens driver would deliver an average of three loads a day; and most Athens drivers had the opportunity to take their meal periods. Plaintiff was free to decide for himself when to pick up loads any time during Athens's loading hours, between 5:30 a.m. and 7:00 p.m. There were lunch trucks at the landfills and at the Athens facility, as well as fast food restaurants along the route.

This evidence severely undercuts plaintiff's claim that he could not transport three loads a day without missing his meal break; he had to eat in the truck as he drove; and he never once got a meal break in his four years of employment by All Service.

16

Given plaintiff's overall lack of credibility (the trial court stated after closing arguments that "[p]laintiff lacks credibility as a trial witness and his testimony was impeached ma[n]y times during the trial"), we find no reason to question the trial court's finding that plaintiff did not prove he was denied meal and rest breaks.

Plaintiff's second argument is that the employer is obliged to record meal periods, and if an employer's records do not show meal periods, a rebuttable presumption arises that no meal period was provided. This principle was settled in *Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58, 74 (*Donohue*), a case decided after the trial court's ruling in this case. But the *Donohue* principle does not assist plaintiff's case because defendant here *did* rebut that presumption.

*Donohue* tells us the burden of proof is on the employer to show it relieved the employee of duty, but the employee waived the opportunity to take a work-free break. (*Donohue, supra,* 11 Cal.5th at p. 74.) *Donohue* explains that if employer records "are incomplete or inaccurate—for example, the records do not clearly indicate whether the employee chose to work during meal periods despite bona fide relief from duty—then the employer can offer evidence to rebut the presumption." (*Id.* at p. 76.)

*Donohue* "reiterate[d] the rules set forth in *Brinker*." (*Donohue, supra,* 11 Cal.5th at p. 78.) Those rules include that "[a]n employer is liable only if it does not provide an employee with the opportunity to take a compliant meal period. The employer is not liable if the employee chooses to take a short or delayed meal period or no meal period at all. The employer is not required to police meal periods to make sure no work is performed." (*Ibid.*)

Here, plaintiff's daily log sheets (38 daily log sheets from 2014) showed plaintiff did not fill in the space on his log sheets for recording meal periods. (These are the only employer daily time records in evidence. All Service stored its drivers' log sheets at the All Service lot in a cargo container, and the rest of the records were made illegible because of water damage.)

We have already recounted the evidence showing that plaintiff had time, like most of the other drivers employed by Athens, to make three loads and also take meal breaks. It may have been true that sometimes, as was sometimes the case with Athens's transfer drivers, plaintiff missed a meal break. But plaintiff testified he *never* got a meal break; according to plaintiff, *every day* for four years, he had to eat lunch as he drove his truck. This defies credulity.

Plaintiff did not have a 9:00 to 5:00 job with a fixed time slot for his lunch break. Both Athens and All Service gave plaintiff wide latitude in deciding how he spent his workday, and All Service paid all regular and overtime hours plaintiff reported without question. Mr. Sarkissian testified he told plaintiff when he was first employed that he was free to take a lunch break "[w]henever he chose to," and plaintiff does not dispute that. (See *Brinker, supra,* 53 Cal.4th at p. 1040 [an employer's knowledge of employees working through meal periods "will not alone subject the employer to liability for premium pay; employees cannot manipulate the flexibility granted them by employers to use their breaks as they see fit to generate such liability"].)

Substantial evidence supported the trial court's implied finding that plaintiff is trying to manipulate and exploit the flexibility his employers gave him to take his breaks when and as he saw fit.

18

### 3. The Wage Statement and Failure to Pay on Termination Claims

"An employer, . . . at the time of each payment of wages, shall furnish to his or her employee . . . an accurate itemized statement in writing" showing specified information. (§ 226, subd. (a).) An employee who did not receive a wage statement "as a result of a knowing and intentional failure by an employer to comply" with these requirements is entitled to recover specified penalties. (§ 226, subd. (e)(1), (e)(2)(A).) Likewise, "[i]f an employer discharges an employee," wages earned and unpaid are due and payable immediately (§ 201, subd. (a)), and "[i]f an employer willfully fails to pay . . . in accordance with" section 201, the wages continue as a penalty for up to 30 days (§ 203, subd. (a)).

At trial, Mr. Sarkissian admitted that All Service did not provide wage statements to plaintiff during 2014. The trial court accordingly found plaintiff was entitled to penalties totaling $4,000 from All Service. The court also found Mr. Sarkissian did not give plaintiff his final check until more than two weeks after termination, and this established All Service failed to pay plaintiff timely on termination, entitling plaintiff to $3,366 in penalties.

The court found joint employer Athens was not liable for the penalties attached to these claims. As to the wage statements, this was because Athens "did not have any knowledge, control or input as to how All Service[] handled its paychecks to its employees or what All Service included on those paychecks," and so "did not willfully and intentionally violate Labor Code, section 226." As to the failure to pay on termination, the court stated the evidence demonstrated Athens "did not have

19

any knowledge or control over when Defendant All Service paid Plaintiff," and therefore found Athens "did not willfully fail to timely pay Plaintiff."

Plaintiff contends the trial court erred because sections 226 and 203 "impose liability on all joint employers solely by virtue of their employer status." We are not persuaded this is so under the circumstances reflected in this record. Some joint employment conditions justify liability of both employers, but that is not the case here.

The evidence was undisputed that Athens had no control "or even any input" on All Service's handling of its employee paychecks and wage statements, and that Athens did not discharge plaintiff and had no reason to know if or when plaintiff was terminated by All Service. The penalties that attach to All Service's violations apply to "a knowing and intentional failure" to furnish wage statements (§ 226, subd. (e)(1)), and to "willfully fail[ing] to pay" wages immediately on discharge (§§ 203 & 201, subd. (a)). Given the facts the trial court found, and the statutory language requiring "knowing and intentional" or "willful[]" failures, we cannot conclude that Athens should be liable.

"Willful" means that " 'the employer intentionally failed or refused to perform an act which was required to be done.' " (*Kao v. Holiday* (2017) 12 Cal.App.5th 947, 963, italics omitted.) Similarly, "[t]o establish a 'knowing and intentional' violation of Labor Code section 226, subdivision (a), an employee must demonstrate that the employer was ' "aware of the factual predicate underlying the violation[s]." ' " (*Furry, supra,* 30 Cal.App.5th at p. 1085.) Awareness of the factual predicate is missing here.

20

We emphasize this is not a case where the employee has not been paid all wages due for his work. Where the issue is unpaid wages, entities found to be joint employers are liable for the payment of wages. This was established in *Martinez v. Combs* (2010) 49 Cal.4th 35 (*Martinez*).

In *Martinez,* the court examined "the concept of joint employment" (*Martinez, supra,* 49 Cal.4th at p. 50) and how to "define the employment relationship, and thus identify the persons who may be liable as employers, in actions under section 1194" (*id.* at p. 51). (Section 1194 entitles the employee to recover the unpaid balance of minimum wage and overtime compensation.) *Martinez* held that in actions under section 1194, IWC wage orders "do generally define the employment relationship, and thus who may be liable." (*Martinez,* at p. 52.) To employ means "(a) to exercise control over the wages, hours or working conditions, *or* (b) to suffer or permit to work, *or* (c) to engage, thereby creating a common law employment relationship." (*Id.* at p. 64.) These definitions "do apply in actions under section 1194" (*id.* at p. 66), and "impose[] liability on multiple entities who divide among themselves control over those different aspects of the employment relationship" (*id.* at p. 67).

As the court stated in *Noe v. Superior Court* (2015) 237 Cal.App.4th 316 (*Noe*), "[i]mplicit in the [*Martinez*] analysis is a recognition that section 1194 permits an employee with multiple employers to seek recovery of unpaid wages from any of them." (*Id.* at p. 333.) This is not based on principles of agency or joint and several liability, but rather such liability "attaches as the result of section 1194, which imposes a duty on every employer to ensure its employees receive minimum wage and

21

overtime compensation." (*Ibid.*) *Noe* thus rejected the broader claim "that joint employers are normally held jointly liable for Labor Code violation committed by a coemployer," finding no language in *Martinez* supporting that theory. (*Noe,* at p. 332.)

*Noe* involved the Labor Code's prohibition on willful misclassification of an employee as an independent contractor (§ 226.8, subd. (a)(1)). Section 226.8 defines "[w]illful misclassification" as avoiding employee status for an individual by "voluntarily and knowingly misclassifying" that individual as an independent contractor. (§ 226.8, subd. (i)(4).) *Noe* held that liability "is not limited to employers who make the misclassification decision, but also extends to any employer who is aware that a coemployer has willfully misclassified their joint employees and fails to remedy the misclassification." (*Noe, supra,* 237 Cal.App.4th at pp. 319–320.)

Thus, *Noe* applied the principle that "whether an employer is liable under the Labor Code depends on the duties imposed under the particular statute at issue." (*Noe, supra,* 237 Cal.App.4th at p. 334.) *Noe* stated: "Applying those principles here, if plaintiffs prove defendants were their joint employers, those defendants may be held liable under section 1194 for any unpaid minimum wage and overtime compensation resulting from plaintiffs' misclassification. [Citation.] To obtain civil penalties under section 226.8, however, plaintiffs must demonstrate not only that defendants were joint employers, but also that . . . they each engaged in the act of voluntarily and knowingly misclassifying plaintiffs." (*Ibid.* [rejecting the "suggestion that defendants may be subject to section 226.8 penalties based solely on their status as joint employers of workers who were misclassified by a coemployer"]; see also

*Serrano v. Aerotek, Inc.* (2018) 21 Cal.App.5th 773, 784 ["*Noe* made clear that whether an employer is liable for a coemployer's violations depends on the scope of the employer's own duty under the relevant statutes, not 'principles of agency or joint and several liability' "], disapproved on another ground in *Donohue, supra,* 11 Cal.5th at p. 77.)

The same principle applies in this case. "Any employer" is subject to civil penalties "for each underpaid employee" when the employer violates Labor Code provisions or wage orders regulating hours and days of work. (§ 558, subd. (a).) But the statutory penalties for failing to provide wage statements and failing to pay immediately on termination apply to "knowing and intentional" or "willful[]" failures, respectively. (§§ 226, subd. (e)(1) & 203, subd. (a).) Under the facts of this case, without knowledge of or reason to know that All Service had stopped providing wage statements to its employees, or that it had terminated plaintiff without immediately paying him, Athens cannot be liable for All Service's violations.

Plaintiff insists otherwise, but in support cites only one federal district court decision, which is not binding, and two superior court decisions, which are not citable under California Rules of Court, rule 8.115. In *Liu v. Win Woo Trading, LLC* (N.D.Cal., June 13, 2016, No. 14-cv-02639-KAW) 2016 U.S.Dist.Lexis 76776, page *15, the court denied summary judgment on a section 226 wage statement claim. The court said only that the defendants conceded they could produce no legal authority to support the proposition that joint employers should not be held jointly liable for the section 226 violation. There is no legal analysis of the point, and accordingly *Liu* has no persuasive or precedential value.

23

In short, under the circumstances here, we see no basis for concluding Athens willfully failed to pay plaintiff immediately on his termination by All Service, or that there was "a knowing and intentional failure" by Athens to provide plaintiff with wage statements.

## 4. The PAGA Claim

Plaintiff contends the court erred in declining to award civil penalties under PAGA for the failure to pay wages on termination and the wage statement violations. Because we have determined Athens was not liable for these violations, the PAGA claims against Athens necessarily fail as well.

## 5. Plaintiff's Appeal of the Costs Award

Code of Civil Procedure section 1032 governs the recovery of costs by a prevailing party as a matter of right. Subdivision (a)(4) (section 1032(a)(4)) specifies who is a prevailing party.[2]

"Generally, the prevailing party in 'any action or proceeding' is entitled to costs as a matter of right. (§ 1032,

---

[2] Section 1032(a)(4) states: " 'Prevailing party' includes the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant. If any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed, may apportion costs between the parties on the same or adverse sides pursuant to rules adopted under Section 1034." And, "[e]xcept as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (§ 1032, subd. (b).)

subd. (b).) By statute, a defendant against whom a plaintiff recovers no relief is a 'prevailing party.' (*Id.*, subd. (a)(4).) A trial court has no discretion to deny prevailing party status to such a defendant." (*Huerta v. Kava Holdings, Inc.* (2018) 29 Cal.App.5th 74, 79 (*Huerta*); *Charton v. Harkey* (2016) 247 Cal.App.4th 730, 738 [" '[T]he trial court has no discretion to deny prevailing party status to a litigant who falls within one of the four statutory categories in the first [sentence] of [section 1032 (a)(4)]." (Third brackets added.)].)

As indicated earlier, the trial court awarded Athens costs of $24,149.23 as the prevailing party. The court cited section 1032(a)(4) and identified the applicable category: "a defendant as against those plaintiffs who do not recover any relief against that defendant." (*Ibid.*) The court concluded that, "pursuant to [section 1032(a)(4)], [Athens] is a prevailing party by operation of law." (Underscore omitted.)

Plaintiff challenges the award, contending that, because Athens was found to be a joint employer, Athens was not entitled to costs as a matter of right. Instead, he says, the court should have exercised the discretion it has to determine the prevailing party under the second sentence of section 1032(a)(4), that is, "[i]f any party recovers other than monetary relief and in situations other than as specified." But plaintiff did not "recover[] other than monetary relief"—he recovered nothing from Athens. Nor is this a "situation[] other than as specified" in the first sentence of section 1032(a)(4), that is, "a defendant as against those plaintiffs who do not recover any relief against that defendant."

Plaintiff insists—citing and discussing at length authorities that are entirely inapt and facts that do not matter—that Athens was not the prevailing party because plaintiff recovered against

25

its joint employer, and "that by itself should be sufficient" to make plaintiff the prevailing party.

Of course, it is not sufficient, under the plain language of the costs statute, and we are not at liberty to conclude otherwise. The trial court had no discretion to deny prevailing party status to Athens (*Huerta, supra,* 29 Cal.App.5th at p. 79), so the costs award was proper.

## DISPOSITION

The judgment and the postjudgment order are affirmed. Defendant shall recover costs of appeal.


GRIMES, Acting P. J.


WE CONCUR:


WILEY, J.


OHTA, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.